STATE of Wisconsin, Plaintiff-Respondent,

v.

Tito J. LONG, Defendant-Appellant.†

Court of Appeals

*No. 01–1147–CR. Submitted on briefs March 21, 2002.— Decided April 24, 2002.*

2002 WI App 114

(Also reported in 647 N.W.2d 884.)

† Petition to review denied 9-26-02.

On behalf of the defendant-appellant, the cause was submitted on the brief of *Ann T. Bowe* of Milwaukee.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *James E. Doyle*, attorney general, and *James M. Freimuth*, attorney general.

Before Nettesheim, P.J., Brown and Anderson, JJ.

¶ 1. BROWN, J. Tito J. Long opened fire in a crowded bar, resulting in a conviction of first-degree intentional homicide, party to a crime, while using a dangerous weapon and ten counts of recklessly endangering safety. He argues that evidence of gang affiliation is only admissible if the State's theory of the case is that the crime was gang-related. Because this was not a gang-related crime, Long argues that the gang-affiliation evidence was irrelevant and prejudiced the jury. We hold that evidence of gang affiliation was properly admitted in this case to suggest the possible bias of the witnesses in shaping their testimony.

¶ 2. Long also claims that the trial court erred by allowing the State to present testimony from an eyewitness who was not found or identified until after the trial had begun. We determine that the State demonstrated good cause for failing to locate the eyewitness. Also, because the defense was afforded the opportunity to interview the eyewitness before he testified, Long's due process right to fundamental fairness in the trial process was not compromised. Finally, Long claims he is entitled to a new trial because the trial court erred in refusing to grant his request to give the jury a falsus in uno instruction. We affirm the trial court's exercise of discretion in denying the request.

¶ 3. On May 25, 2000, after an eight-day trial, a jury found Long guilty of eleven crimes: one count of first-degree intentional homicide, party to a crime, while using a dangerous weapon; nine counts of first-degree recklessly endangering safety, party to a crime, while using a dangerous weapon; and one count of second-degree recklessly endangering safety, party to a crime, while using a dangerous weapon.[1]

¶ 4. These convictions stem from Long's alleged conduct of firing multiple gunshots inside a crowded Racine bar, Leslie's Continental Bar, at approximately 1:00 a.m. on April 25, 1999. Bar patron Julian Barkley was killed by a single gunshot wound to the heart. Long's gunfire also allegedly resulted in wounds to

---

[1] On July 3, 2000, the trial court sentenced Long to life imprisonment plus five years on the homicide conviction, setting a parole eligibility date of July 3, 2022. The court imposed six-year prison terms on each of the nine convictions of first-degree reckless endangerment and a three-year prison term on the one conviction of second-degree reckless endangerment, all of which run concurrently with each other and with the life term.

Avery Thomas, Christopher Mayfield and Jeremy Koker and endangered the safety of other people in the immediate vicinity.

¶ 5. The State's theory was that Long pulled out a Glock 9–mm semiautomatic handgun and fired multiple times at Thomas after Thomas had walked up to Long in the bar and punched Long in retaliation for an incident earlier in the day. Under the State's theory, Barkley was shot and killed by a bullet that Long had intended for Thomas. The defense theory was that someone else in the bar, not Long, fired the gunshots.

¶ 6. At trial, Thomas testified that on the afternoon of April 24, 1999, he and Long had a physical confrontation in a Walgreens parking lot. Thomas said Long accused him of stealing a gun from Long. Thomas claimed that Long was beating him while holding a gun in his hand until police came and the parties ran.

¶ 7. The afternoon confrontation between Long and Thomas resumed that night at Leslie's bar. By midnight, the bar was crowded and noisy. Witnesses estimated that anywhere from fifty to one hundred persons were inside the small bar. Thomas arrived at the bar with Keyantea Milton and Falandric Williams (nicknamed "Prume"). Thomas testified that he initially was denied entry for lack of proper identification. He said he later got inside the bar briefly and spotted Long but was made to leave for bringing in liquor.

¶ 8. Before entering the bar a third, fateful time, Thomas apparently spoke to Milton about fighting Long and directed Milton to have Christopher Mayfield come outside. According to Mayfield, Thomas asked if Mayfield had a gun that Thomas could use to retaliate against Long for the earlier incident. Thomas denied making such a request. Thomas and Mayfield both

testified that Mayfield accompanied Thomas when he entered the bar a third time.

¶ 9. Three of the State's witnesses described the events that transpired next, including the identification of Long as the shooter. Thomas testified that he walked up to Long, said a few words and punched Long in the face. He said Long "rock[ed] back a couple of feet" after Thomas punched him. Then Long "[p]ulled out a gun" somewhere "from his side" and "got to shooting." Although Thomas said he did not get a good look at the black handgun, he said it resembled Exhibit 9 at trial, the 9–mm Glock handgun that Long would later give to police. Thomas testified that he was wounded in the left index finger and right forearm as he turned to run. Thomas told police that Long shot directly at him from about eight feet away. Thomas told police that someone said Mayfield shot back over Thomas' head after Long began shooting.

¶ 10. Mayfield testified that Long shot at Thomas with a black gun and continued to shoot at Thomas while pursuing Thomas through the bar. Mayfield said he heard up to five shots and was himself shot in the left thigh.

¶ 11. On cross-examination of police investigator Mark Sorensen, Long elicited testimony that Mayfield "had a beef" with Long and Long's friends at some point in 1999 before the April 24, 1999 shooting. On cross-examination of police investigator William Warmington, Long elicited testimony that police had information dating two months before the shooting suggesting that Mayfield "wanted to do harm" to Long.

¶ 12. Falandric Williams also testified to witnessing the shooting inside the bar. He said that while ordering a drink at the bar, he heard "a loud slap or punch" and turned to see Thomas "jump[] back" from

Long and "throw his hands up" as if in a boxer's stance. Williams testified that he then heard gunshots and saw Long pointing a black Glock handgun forward. He said Long's hand "jerk[ed] back" upon firing the gun. He said he did not see Mayfield with a gun.

¶ 13. Other witnesses reported hearing multiple shots, both inside and outside of the bar, but none testified to seeing any shooter. Rose Barkley, the mother of the decedent, testified that two to three days after the shooting, Long visited her house. She said that when she showed Long her son's bloodstained glasses, Long cried, told her he was sorry and that "he believed that he was the one [who] shot Julian." She said that she told investigator Warmington of Long's statement. Warmington testified that Barkley did not say that Long confessed to shooting her son but that Long had cried the hardest about it and had apologized to her. Other impeachment evidence introduced at trial, including testimony about gang affiliations of Long and some of the witnesses, is discussed below.

## Admissibility of Gang Affiliations

¶ 14. At a pretrial hearing, Long moved to exclude evidence that certain witnesses were affiliated with either the "Sixth Ward" or "One Deuce" faction of the Gangster Disciples. Long also sought to exclude expert testimony from investigator Warmington on how such affiliations are manifested and the existence of a street code of silence among gang members in relating to police. The prosecutor argued that evidence of gang ties was relevant to show bias in witness testimony and would influence witness perceptions of the events as they occurred in the bar. The prosecutor also outlined

Warmington's background in gang-related matters, highlighting his experience at the Sixth Street community policing house.

¶ 15. The trial court accepted the State's position that evidence of gang ties of witnesses could assist the jury in determining credibility, indicating that such evidence would require as a predicate that the witness testify. The court also concluded that Warmington was properly qualified as an expert on how gang affiliations are manifested, but disallowed any discussion regarding a street code of silence among witnesses.

¶ 16. On appeal, Long argues that evidence of gang affiliations among witnesses was improper character evidence or, alternatively, constituted inadmissible "other acts" evidence against him. He claims this evidence was unfairly prejudicial to him and was irrelevant to the State's theory of the case. In support, he cites to the fact that the State never alluded to the gang evidence in its opening or closing statements. Indeed, the State agrees that the simmering dispute between Long and Thomas concerned non-gang-related matters.

¶ 17. The admissibility of evidence is within the sound discretion of the trial court. *State v. Brewer*, 195 Wis. 2d 295, 305, 536 N.W.2d 406 (Ct. App. 1995). The decision of the trial court will not be reversed on appeal if there is a reasonable basis for the decision and it was made in accordance with accepted legal standards and with the facts of record. *Id.* We determine that the trial court admitted the evidence of gang ties on the reasonable basis that such affiliations might color the testimony of the various witnesses. We acknowledge Long's concern that evidence of a person's gang ties may imply that the person is of questionable character and perhaps that the person has engaged in prior bad acts, if

not criminal conduct. Nonetheless, evidence that a witness belongs to an organization, such as a street gang, is admissible to impeach the witness's testimony by showing bias. We find instructive the following comments from the United States Supreme Court:

> Bias is a term used in the "common law of evidence" to describe the relationship between a party and a witness which might lead the witness to slant, unconsciously or otherwise, his testimony in favor of or against a party. Bias may be induced by a witness' like, dislike or fear of a party, or by the witness' self-interest. Proof of bias is almost always relevant because the jury, as finder of fact and weigher of credibility, has historically been entitled to assess all evidence [that] might bear on the accuracy and truth of a witness' testimony . . . .

> [Thus, a] witness' and a party's common membership in an organization, even without proof that the witness or party has personally adopted its tenets, is certainly probative of bias.

*United States v. Abel*, 469 U.S. 45, 52 (1984). Moreover, the type of organization in which a witness and a party share membership may be relevant to show the source and strength of the witness's bias. *Id.* at 54. Thus, in *Abel*, the Supreme Court held that the government was properly allowed to impeach the testimony of a defense witness by extrinsic evidence that the witness and the defendant both belonged to the Aryan Brotherhood, "a secret prison sect sworn to perjury and self-protection." *Id.*

¶ 18. Wisconsin law is in accordance with the principle set forth in *Abel*. Our supreme court has stated that "[t]he bias or prejudice of a witness is not a collateral issue[,] and extrinsic evidence may be used to prove that a witness has a motive to testify falsely." *State v. Williamson*, 84 Wis. 2d 370, 383, 267 N.W.2d

337 (1978). Although *Williamson* did not address the use of gang affiliation to prove a motive to testify falsely, we determine that the admission of such evidence is a logical extension of its holding.

■

¶ 19. We now apply the law to the facts at hand. For a witness's gang affiliation to be relevant to show bias in favor of Long, the State was required to establish Long's gang affiliation. *See United States v. Takahashi*, 205 F.3d 1161, 1165 (9th Cir. 2000). Of the State's thirty trial witnesses, only Mayfield identified Long as affiliated with a gang, specifically, the "Sixth Ward" faction of the Gangster Disciples. In addition, Long himself elicited investigator Warmington's opinion that Long belonged to the "Sixth Ward" faction. This sufficiently established Long's affiliation and provided the basis for the State to use the similar affiliations of other witnesses to impeach their testimony.

¶ 20. For example, bar patrons Jeremy Koker and Shawnte Williams acknowledged standing on either side of Long at the back stairs of the bar when the shooting began. Yet both Koker and Williams suggested that the shots erupted from somewhere else in the room and that they did not see any gun or shooter. Williams professed no recollection of telling police that the shots had come from right next to him, causing his ears to ring. Evidence that Koker, Williams and Long were affiliated with the same "Sixth Ward" gang faction could give jurors good reason to question the credibility of Koker and Williams on where the shots originated and, by inference, on their assertions that they did not see Long fire any shots.

¶ 21. Additionally, witness Mark Coldtrain was also affiliated with the "Sixth Ward." Evidence of his gang ties to Long undercut his suggestion to police that Mayfield,[2] not Long, had fired the shots inside the bar.

¶ 22. The admissibility of gang affiliation evidence for impeachment purposes is not altered by the fact that Koker, Williams and Coldtrain were called as State witnesses. "[T]he credibility of a witness may be attacked by any party, including the party calling the witness." WIS. STAT. § 906.07 (1999–2000).[3]

█

¶ 23. Nevertheless, Long argues the probative value of the gang affiliation evidence was outweighed by the risk of unfair prejudice and confusion of the issues. Our careful review of the record, however, supports the State's response that the prosecutor did not belabor the point of any witnesses' gang associations, including Long's. After Warmington identified Koker, Williams and Coldtrain as affiliated with the same "Sixth Ward" faction as Long, the investigator spoke in general terms about how clothing colors, tattoos, and hand signs enable authorities to link individuals to gang factions. Furthermore, as Long concedes, the witnesses' gang activities did not play a prominent role in either the State's opening or closing arguments. Therefore, we are not convinced that the evidence of gang affiliations so permeated the trial as to create a risk of unfair prejudice or confusion of the issues.

---

[2] Mayfield admitted to affiliation with the rival faction "One Deuce" and other testimony indicated that Mayfield and Long "had a beef."

[3] All references to the Wisconsin Statutes are to the 1999–2000 version unless otherwise noted.

## Testimony of William Warmington

■

¶ 24. Long also complains that investigator Warmington was not qualified pursuant to Wis. Stat. § 907.02 to testify as an expert on how gang affiliations are manifested. On direct examination, Warmington described the different factions of the Gangster Disciples in Racine, identified State witnesses and their ties to specific factions and explained the particulars of gang dynamics. He only identified Long's "Sixth Ward" affiliation when Long elicited the testimony as an attempt to discredit the testimony against him of rival gang member Mayfield. He also said that gang members are reluctant to admit their gang affiliations to police but are more willing to identify rival gang members and implicate them in criminal activity.

■

¶ 25. Under Wis. Stat. § 907.02, "if a witness is qualified as an expert and has specialized knowledge that is relevant because it will assist the trier of fact to understand the evidence or determine a fact in issue, the expert's analysis or opinion will normally be admitted into evidence." *State v. Watson*, 227 Wis. 2d 167, 187, 595 N.W.2d 403 (1999). The determination of whether an expert's testimony will assist the fact finder to understand the evidence or to resolve a fact in issue "is a discretionary decision of the [trial] court." *Id.* at 186. We will uphold the decision of the trial court if it examined the facts of record, applied a proper legal standard and employed a rational process to reach a reasonable conclusion. *Id.*

¶ 26. We have no doubt whatsoever that investigator Warmington was properly qualified by training and experience to testify about gang activity in Racine.

Warmington is a sixteen-year police veteran who has received formal "basic and advanced gang training" and has worked in the street crimes unit specializing in gang activities. In addition, he was assigned to the community policing house in the "Sixth Ward" district where he worked with probation agents and became familiar with the neighborhood's activities. In the two years prior to this incident, he was the lead investigator in six gang-related homicides and investigated more than one hundred gang-related shootings. We agree with the trial court's conclusion that Warmington's training and experience compare favorably to those of the officer who was properly qualified as a youth-gang expert in *State v. Whitaker*, 167 Wis. 2d 247, 257, 481 N.W.2d 649 (Ct. App. 1992).

### Testimony of Falandric Williams

¶ 27. Long asserts that he is entitled to a new trial based on the trial court's error in allowing the State to present the testimony of Falandric Williams, who was not named as a witness until the fourth day of trial. Prior to the testimony of Williams, only Thomas and Mayfield had placed a gun in Long's hand. They had been impeached by the records of their prior convictions amassed at relatively young ages.[4] In addition, a witness overheard Mayfield describe Long as a "bitch ass nigger" and Thomas was overheard to be looking for a "cannon" because he was "fitting to handle [his] business." Williams, who affiliated with "Villa Street," a third faction of the Gangster Disciples, thus was a

---

[4] Twenty-year-old Thomas admitted to twelve prior convictions and twenty-four-year-old Mayfield admitted to eleven prior convictions as an adult and three juvenile adjudications.

743

neutral third person who placed the gun in Long's hand. Long argues that the State failed to demonstrate good cause for not locating and naming Williams on its pretrial witness list and that the court was required to exclude Williams under Wis. Stat. § 971.23(7m)(a).

¶ 28. Williams' connection to the case first arose under the moniker "Prume" in a police report that was generated after the shooting and turned over to the defense as part of discovery. At this early stage of the investigation, it is unclear whether the police were able to link this nickname to Williams.[5] At some point, however, the link was established and police were actively looking for Williams. Williams, however, was wanted on outstanding warrants for unrelated matters and, by his own admission, was actively avoiding the police, even to the extent of fleeing when police pursued a vehicle that he was driving.

¶ 29. Only when Mayfield testified on the second day of trial did it become apparent that Williams would be a crucial witness. Mayfield referred to a person named "Prune" (also called "Prume") as being in the company of Thomas outside the bar before the shooting. Mayfield was unable to connect "Prune" with the name "Williams" until the next day when shown his picture by the prosecutor.

¶ 30. On May 18, 2000, the fourth day of trial, the prosecutor moved to add Williams to the State's witness list. The prosecutor said she had gone to the jail the day before to obtain Williams' photo and discovered that Williams was in jail, apparently on a probation or parole hold. She said Warmington had just interviewed Will-

_____

[5] Warmington testified on cross-examination that police were aware that Falandric Williams was "Prume" for about one year.

744

iams as reflected in a report that the State was giving to defense counsel. It also was established that Williams had been in custody once before since the shooting—from June 26, 1999, to July 19, 1999.

¶ 31. The trial court granted the motion to allow Williams' testimony, finding that the police had made a serious effort to locate Williams and that Williams was actively avoiding discovery. The trial court also concluded that the police failure to discover Williams when he was jailed in June and July was not for lack of due diligence since "that was still at the very beginnings of the basic investigation that was going on" in this case. The defense was then allowed to interview Williams before he testified on the fifth day of trial.

¶ 32. Pursuant to Wis. Stat. § 971.23(1)(d), upon demand by the defense, a prosecutor must disclose within a reasonable time before trial a list of witnesses and their addresses whom the district attorney intends to call at trial, other than impeachment or rebuttal witnesses. This duty applies to the extent that the information is within the possession, custody or control of the State. Sec. 971.23(1). If during trial a prosecutor discovers the names of additional witnesses that he or she intends to call, the prosecutor must notify the defense. Sec. 971.23(7).

■

¶ 33. Wisconsin Stat. § 971.23(7m)(a) provides that as a sanction for noncompliance with the duty to disclose, the court "shall exclude any witness not listed . . . unless good cause is shown for failure to comply." Under this provision, the court may grant the opposing party a recess or continuance. If good cause is not shown, exclusion of the witness is mandatory. *See State v. DeLao*, 2001 WI App 132, ¶ 28, 246 Wis. 2d 304, 629 N.W.2d 825, *aff'd*, 2002 WI 49, 252 Wis. 2d 289, 634

N.W.2d 480. The burden to show good cause rests with the State and whether it has satisfied this burden is a question of law that we review de novo. *Id.* at ¶ 23.

¶ 34. We do not understand the State to argue that no discovery violation occurred here. Rather, the State contends there was good cause for the violation based upon the enormity of the pretrial investigation involving one hundred possible witnesses and Williams' own efforts to evade police and avoid testifying. Long asserts that the State's purported due diligence in trying to locate Williams is belied by the fact that Williams had been in jail for a month on two occasions before trial. For support, Long cites to *Jones v. State*, 69 Wis. 2d 337, 348–49, 230 N.W.2d 677 (1975), holding that the prosecutorial unit, which includes both the district attorney's and law enforcement offices, must be viewed as one for the purposes of discovery.

¶ 35. Under the facts of this case, we determine that the State has met its burden to show good cause why it failed to place Williams on its witness list. The State had been investigating a substantial number of witnesses on an ongoing basis and had regularly provided the defense with the names of witnesses as it learned them. At some point, Williams' name must have surfaced during the investigation because Warmington testified that he had known Williams was "Prume" for about one year and that police had been trying to locate him. However, Williams, as he testified at trial, had avoided police because he did not want to become involved or testify in the case. Without being able to interview Williams, the State could not determine what value he had, if any, as a potential witness.

¶ 36. The fact that Williams had been in jail on two occasions before trial does not defeat the State's exercise of due diligence in looking for him. During

Williams' incarceration, there was no indication that he might be a witness of greater importance than any other of the numerous witnesses being sought. In such a case, spot-checking jail records to see if he may have been apprehended on an unrelated warrant was a reasonable exercise of due diligence.

¶ 37. The present case is thus distinguishable from *DeLao*. In that case, the State failed to timely disclose the defendant's recorded statements because the police failed to alert the prosecutor of their existence in police possession before trial. *DeLao*, 2001 WI App 132 at ¶ 6. The value of those statements was known and, if admitted, would have impeached the defendant's testimony. The court imputed the knowledge of the police to the prosecutor, viewing them as one prosecutorial unit. *Id.* at ¶ 27. In the present case, the existence of Williams' value as a witness was not known until after trial began. We are not compelled, therefore, to apply the rule of *DeLao* to this case. We determine under these facts the State has met its burden to justify its failure to place Williams' name on the witness list.

■■

¶ 38. Having concluded that good cause existed for the late revelation of Williams as a witness, we do not see that this resulted in trial by ambush. *See State v. Guzman*, 2001 WI App 54, ¶ 22, 241 Wis. 2d 310, 624 N.W.2d 717, *review denied*, 2001 WI 88, 246 Wis. 2d 166, 630 N.W.2d 219 (Wis. May 8, 2001) (No. 99–2249–CR). The trial court properly granted a recess to allow Long to interview Williams. Long makes no complaint that this opportunity was insufficient to prepare an adequate cross-examination of Williams or to pursue an investigation of the information he provided.

## The Falsus in Uno Instruction

**■■■**

¶ 39. Finally, Long seeks a new trial on the ground that the trial court wrongly denied his request for a falsus in uno instruction directed at State witnesses Avery Thomas and Rose Barkley. The falsus in uno instruction is set forth in WIS JI—CRIMINAL 305:

> If you become satisfied from the evidence that any witness has willfully testified falsely as to any material fact, you may disregard all the testimony of the witness which is not supported by other credible evidence in the case.

Long concedes that the falsus in uno instruction is disfavored in the law. *State v. Lagar*, 190 Wis. 2d 423, 433, 526 N.W.2d 836 (Ct. App. 1994). Nevertheless, he asserts that the instruction is applicable in this case because the false testimony of Thomas and Barkley was both willful and intentional. *See id.*

¶ 40. Barkley, the mother of the homicide victim, testified that Long had confessed to her a couple of days after the shooting. She said she told investigator Warmington of Long's statement. Warmington said Barkley did not tell him that Long confessed to shooting her son but did tell him that Long had cried the hardest about it and had apologized to her.

¶ 41. We do not agree that the discrepancy in the testimony between Warmington and Barkley manifests willful and intentional falsification by Barkley. The discrepancy may well be attributable to possible mistake or misunderstanding. In that event, resolution of the inconsistency is for the jury in determining witness credibility and is not the basis for a falsus in uno instruction. *See State v. Robinson*, 145 Wis. 2d 273, 281, 426 N.W.2d 606 (Ct. App. 1988) (discrepancies in testi-

mony attributable to defects of memory or mistake are no basis for rejecting a witness's testimony entirely).

¶ 42. Long also argues that a falsus in uno instruction should have been directed at Thomas because Thomas had lied to police about his earlier altercation with Long, telling them that it occurred somewhere else and was "about a woman" rather than a gun theft. In addition, Thomas failed to tell police that prior to being shot "he struck Long without provocation." Thomas later told the police the truth, that the prior incident concerned Long's claim that Thomas had stolen a gun and he eventually told police about punching Long in the bar.

¶ 43. We agree with Long that the truthfulness of the testimony of Thomas is in question. However, the impeachment of a witness with prior statements does not necessarily mean that a falsus in uno instruction is appropriate. *Lagar*, 190 Wis. 2d at 434. The trial court had the benefit of observing the actual testimony of Thomas and could determine whether the instruction was appropriate. After assessing Thomas' testimony, the trial court obviously concluded that the jury would be able to properly assess Thomas' credibility if given the general instruction on witness credibility contained in Wis JI—Criminal 300. We see no error in the trial court's discretionary decision refusing to give the instruction.

¶ 44. In sum, we conclude that the evidence of gang affiliations between the witnesses and Long was properly admitted to show witness bias. Investigator Warmington was properly qualified as an expert witness on gang dynamics. The testimony of Williams was proper because the State showed good cause to explain

its failure to place him on the witness list. Finally, the inconsistencies in the testimony of Barkley and Thomas were not so willful and intentional as to require a falsus in uno instruction.

*By the Court.*—Judgment affirmed.