STATE of Wisconsin, Plaintiff-Respondent,

v.

Thomas C. BURTON, Defendant-Appellant.

Court of Appeals

*Nos. 2006AP2436–CR, 2006AP2437–CR, 2006AP2438–CR.*
*Submitted on briefs September 12, 2007.*
*—Decided October 31, 2007.*

2007 WI App 237

(Also reported in 743 N.W.2d 152.)

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Timothy A. Provis* of Port Washington.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *J.B. Van Hollen*, attorney general, and *Michael J. Losse*, assistant attorney general.

Before Brown, C.J., Anderson, P.J., and Snyder, J.

¶ 1. BROWN, C.J. Thomas C. Burton appeals his convictions stemming from three shootings in Racine. He objects here, as he did in the trial court, to the testimony of a "gang expert" called by the State. The State called the expert for two stated reasons: to explain why certain witnesses might change their stories between the time of the incident and the trial, and to explain that the shootings might have been motivated by Burton's desire to regain respect that he had lost when one of the shooting victims allegedly robbed him and took his pants. Burton argues that absent evidence that he was himself a gang member, the expert's testimony should not have been allowed. We reverse and remand for a new trial. The expert's testimony insinuated, without any basis, that Burton was a part of the gang culture, if not actually a member of a gang. It recast the case as being about gang retaliation or gang culture, anathema to the reasonable citizen, when there was no evidence that the shootings were

405

gang crimes. Not only that, the testimony also purported to explain away the inconsistencies of witnesses simply because gangs infested the neighborhood in which the witnesses lived. If this had any probative value, which we doubt, it was far outweighed by prejudice. Ascribing the purported motivations or truth-telling tendencies of an entire neighborhood to one of its residents is not an acceptable form of impeachment. This case must be retried based on facts, rather than insinuation or stereotyping.

¶ 2. Thomas Burton was tried on fourteen charges arising from three shootings on three separate days. In one incident, Burton allegedly approached a car in which Phillip Bowens was a passenger and fired several shots into the vehicle, hitting Bowens in the thigh. A few weeks later, Burton allegedly fired a gun at Donnis Jones while the two were standing on a public street in the same neighborhood; a ricocheting bullet hit Jones in the leg. One week later, Burton allegedly fired several shots at unknown persons who may also have been shooting at him; one of the bullets struck a young girl in the thigh.

¶ 3. At the trial, various witnesses to the shootings testified. Some of these witnesses stated that they did not see Burton or did not see him with a gun, though police officers testified that these witnesses had stated to the contrary immediately after the shootings. Donnis Jones testified that he was shot by a young man who had attempted to rob him and that while he did not know the shooter, he was certain that it was not Burton. Jones had earlier told police that he knew the person who shot him as "T" and also that "T" had fired several shots at the house Jones fled to immediately after being shot. The State adduced some testimony to the effect that Bowens had earlier robbed Burton of money and

the pants he was wearing. Neither Bowens nor Burton testified.

¶ 4. On the last day of its case-in-chief, the State called Detective William Warmington of the City of Racine Police Department. The State had apparently notified Burton of the broad themes of Warmington's expected testimony, and Burton asked the court to conduct a voir dire outside the presence of the jury to determine whether the testimony would be admissible. The State responded that though Warmington could not classify Burton as a gang member, he would be able to label "some of the other people involved in this trial" as members of the Vice Lords gang. This would be relevant

> to put a context on who some of these people are we're dealing with . . . why this culture wants to cooperate with us, why they don't, why their stories are different on the street than when they hit a courtroom . . . . They talk to officers one way and . . . they testify in the courtroom in another way.

¶ 5. The State further argued that the expert could testify "to the intent on why the people did what they did . . . . This goes to the gang retaliation . . . that we're dealing with, goes to Mr. Burton's intent and retaliating against Phillip Bowens for a prior confrontation."

¶ 6. Burton's attorney argued that allowing the expert to identify Bowens or Jones as Vice Lords would "be an impermissible comment on their character" and that it would unfairly reflect on Burton. He further questioned whether it would be helpful to the jury to have an expert testify as to the behaviors of gang members. The court ruled that Warmington could tes-

tify, stating that "if there is a motion to bar the witness, it is denied . . . . If the testimony of the witness goes beyond . . . being offered for the purpose of intent as an element or dealing with truthfulness, then I think we're in dangerous territory."

¶ 7. Detective Warmington then took the stand. After describing his credentials and experience, he discussed his interactions with Donnis Jones:

Q Do you remember an opportunity to speak with Mr. Jones regarding the case?

A Yes, I did.

Q And was he cooperative with you?

A No.

Q Did he assist you in the prosecution at all?

A No. He flat out said he didn't want to do anything with it.

Q Did you find that unusual?

A No, I didn't.

Q Why not?

A Based on the area of the shooting, the activity up in that area it's not uncommon for people that are victims or witnesses in shootings to not cooperate or want to have anything to do with the police department.

Q Why don't they want to have anything to do with the police department?

A For some it's fear of retaliation, for others it's they in some way, shape or form participated in some-

thing that led to them being shot; they didn't want that to be found.

¶ 8. The State then, over Burton's objection of lack of factual foundation, adduced Warmington's testimony that Jones had "a lot" of police contacts and associated with three known Vice Lords. Then the inquiry shifted back to the issue of gang members' cooperation with police:

Q Now, you indicated that witnesses may not want to cooperate, like Mr. Jones did not want to cooperate with you. Do they use police in certain situations by giving them some information but then withdrawing it or how does that work?

A Well, they use the police a lot of times they get caught in a situation where the police are there and they make a statement, I refer to it as kind of an excited utterance where right after an incident happens they're kind of excited, kind of wound up, they will talk to the police and they will say stuff. Later on down the road they'll try to withdraw those statements or deny that they made them.

Q You said later down the road they will try and withdraw the statements, is that to the police department or to prosecutors?

A Both.

Q Both. Do they usually cooperate when they testify?

A No.

Q Why not, do you know?

A A lot of times it's because they want to settle the issue themselves. Lot of times it's because if they're seen as cooperating . . . they will be referred to as snitches. They will be accused of working for the

police department or the DA's office and not only will they lose the respect of their fellow gang members, but they could also face some physical retribution because of that.

The expert later added that an excited utterance is "[u]sually . . . a very truthful statement."

¶ 9. The prosecutor also asked the expert about gang members' views regarding respect:

Q Is it important for them to have respect or how is that an issue?

A Respect is probably one of the biggest things that the gang members whether Vice Lords, Latin Kings, La Familia respect is very high on their needs list.

Q And how would a member lose respect?

A If they were to be publicly embarrassed. If they were to you would call it be disrespected. They could be, you know, disrespected by the police, they can be disrespected by a member of their own gang or by a citizen. And then they would feel the need to gain that respect back.

Q Would that be through retaliation?

A That could be through retaliation, through physical confrontation, a fight, a shooting.

¶ 10. Burton claims on appeal that the admission of "gang expert" testimony violated his due process rights. The State responds that we should not consider Burton's claim because he has waived it in two ways: first, because he made limited contemporaneous objections to the detective's testimony; second, because he made no due process claim before the trial court.

410

¶ 11. As to the lack of contemporaneous objection, we note that Burton argued strenuously before Warmington testified that his proposed testimony would be irrelevant and prejudicial, and asked that he be subjected to a voir dire outside the jury's presence. The circuit court denied Burton the requested voir dire[1] and further ruled that Warmington could offer testimony going to the truthfulness of the witnesses and to Burton's intent. Burton was not obliged to restate his objections in the jury's presence and thereby emphasize the testimony he believed prejudicial. *See State v. Bergeron*, 162 Wis. 2d 521, 527–29, 470 N.W.2d 322 (1991).[2]

¶ 12. As to Burton's failure to raise a due process claim below, though Burton now states his claim in Constitutional language, his argument here is essentially the same as the one he made in the trial court: that Warmington's testimony was highly and unfairly prejudicial and that its probative value was very limited. Though Burton identifies the Constitution as the grounds of his appeal, the line of cases onwhich he relies deals with evidentiary

---

[1] The court stated that it would allow voir dire for a limited purpose related to a separate matter not at issue in this appeal.

[2] The State also argues that Burton "adduced some of the evidence now complained about on appeal." All of the testimony herein discussed was elicited by the State's direct questioning, with the exception of Warmington's testimony that an "excited utterance" is "usually . . . a very truthful statement." Though Warmington made this statement during cross-examination, it was not directly responsive to the question asked: "Excited utterance means basically just saying something in the heat of the moment, right?" This question does not constitute a waiver on Burton's part.

411

principles.[3] The State has addressed the same cases and arguments. As the State acknowledges, the rule of waiver is one of administration, not authority. *See State v. Moran*, 2005 WI 115, ¶ 31, 284 Wis. 2d 24, 700 N.W.2d 884. We see no just reason to avoid addressing Burton's claims.

■

¶ 13. Evidence is relevant if it has any tendency to make the existence of any fact of consequence to the determination of the action more probable or less probable than it would be without the evidence. Wis. Stat. § 904.01 (2005–06).[4] Although evidence may be relevant, it nonetheless may be excluded if its probative value is substantially outweighed by the risk of unfair prejudice. Wis. Stat. § 904.03. Evidentiary determinations are within the trial court's broad discretion and will be reversed only if the trial court's determination represents a prejudicial misuse of discretion. *See State v. Lindh*, 161 Wis. 2d 324, 348–49, 468 N.W.2d 168 (1991). We will find an erroneous exercise of discretion where a trial court failed to exercise discretion, the facts fail to support the decision, or the trial court applied the wrong legal standard. *State v. Black*, 2001 WI 31, ¶ 9, 242 Wis. 2d 126, 624 N.W.2d 363. "The exercise of discretion contemplates a process of reasoning based on facts that are of record or that are reasonably derived by inference from the record, and a conclusion based on a logical rationale founded upon proper legal stan-

---

[3] *See, e.g., State v. Long*, 2002 WI App 114, ¶ 17, 255 Wis. 2d 729, 647 N.W.2d 884 (discussing the "common law of evidence"); *United States v. Abel*, 469 U.S. 45, 54 (1984) (discussing the Federal Rules of Evidence).

[4] All references to the Wisconsin Statutes are to the 2005–06 version.

dards." *Ocanas v. State*, 70 Wis. 2d 179, 185, 233 N.W.2d 457 (1975).

¶ 14. Burton's central argument on appeal is that Warmington's testimony was squarely barred by *State v. Long*, 2002 WI App 114, 255 Wis. 2d 729, 647 N.W.2d 884. There, we stated that "[f]or a witness's gang affiliation to be relevant to show bias in favor of [the defendant], the State was required to establish [the defendant]'s gang affiliation." *Id.*, ¶ 19. *Long* relied on *United States v. Takahashi*, 205 F.3d 1161, 1165 (9th Cir. 2000), which in turn cites *United States v. Keys*, 899 F.2d 983, 986–87 (10th Cir. 1990), for the same proposition. All three cases ultimately descend from *United States v. Abel*, 469 U.S. 45 (1984). In *Abel*, the prosecution had adduced testimony that both the defendant and a defense witness belonged to a gang which required its members to "lie, cheat, steal [and] kill" to protect each other. *Id.* at 47–48. The Court upheld the admission of this testimony under the Federal Rules of Evidence, noting that common membership in such an organization showed that the defense witness "had a powerful motive to slant his testimony towards" the defendant. *Id.* at 54.[5]

---

[5] The State correctly notes that the Court in *United States v. Abel*, 469 U.S. 45 (1984), did not hold that *only* where the defendant and a witness belong to the same gang can the State introduce evidence of a witness's gang affiliation to show bias in favor of the defendant. In fact, the defendant's complaint in *Abel* was not that gang affiliation tarnished *the witness* in the eyes of the jury; rather, he objected that the jury should not know about *his own* gang membership. *See Abel*, 469 U.S. at 53. Nevertheless, *State v. Long*, 2002 WI App 114, ¶ 19, 255 Wis. 2d 729, 647 N.W.2d 884, stated the broader rule, and *Long* is binding precedent on this court. *See Cook v. Cook*, 208 Wis. 2d 166, 190, 560 N.W.2d 246 (1997).

413

¶ 15. The State argues that despite any lack of evidence that Burton was in a gang with any witnesses, a "logical extension" of *Long* can accommodate Warmington's testimony here. The State argues that Bowens' and Jones' gang connections are relevant to show not, as in *Long*, their bias in favor of the defendant, but rather their "bias against the prosecution." Bias is "the relationship between a party and a witness which might lead the witness to slant, unconsciously or otherwise, his testimony in favor of or against a party." *Abel*, 469 U.S. at 52. It may be "induced by a witness' like, dislike, or fear of a party, or by the witness' self-interest." *Id.* The State claims that Warmington's testimony established that gang members, for reasons of fear or self-interest, have a bias against aiding the State. Thus, evidence of Bowens' and Jones' gang association was relevant to show that they, too, have such a bias.

¶ 16. But the State's focus only on Warmington's identification of Bowens and Jones as gang members ignores the much broader reach of Warmington's testimony.[6] Identifying witnesses as gang members may be admissible where there is a tight fit between their gang membership and some specific motivation to be untruthful, as is generally present in common-membership cases. *See Abel*, 469 U.S. at 47–48. But this

The State also attempts to call *Long* into question by contrasting it to *State v. Brewer*, 195 Wis. 2d 295, 536 N.W.2d 406 (Ct. App. 1995). The issue in *Brewer* was not the same as the one in *Long*. In *Brewer*, the gang expert was called to testify that the presence of gang graffiti is an indicator of drug dealing. *Brewer*, 195 Wis. 2d at 304. In contrast with this case and *Long*, the purpose of the evidence in *Brewer* was not to suggest that the defendant or any witness was in a gang. *Contrast Long*, 255 Wis. 2d 729, ¶ 14, *with Brewer*, 195 Wis. 2d at 308–09.

[6] As noted above, Jones testified; Bowens did not.

is not what Warmington testified to; rather, he spoke in generalities about people "up in that area" not cooperating with the police out of fear of retaliation, or because "they in some way, shape, or form participated in something that led to them being shot." Warmington went on to testify that "witnesses" (here it is unclear whether he is talking about gang members or neighborhood residents) will make "excited utterances" to the police that they later deny.[7]

■

¶ 17. We agree with Burton that this testimony, whether viewed as going to bias or character for truthfulness, was unfairly prejudicial because it invited the jury to discredit the several witnesses who testified favorably to Burton, either by tarring them with undemonstrated gang affiliation or simply based on the neighborhood in which they live. We see little, if any, probative value in this sort of testimony. Our view of the low worth of such evidence is well summed up in *People v. Roberts*, 65 Cal. Rptr. 2d 17 (Ct. App. 1997):

> [Allowing generalized "bias" testimony based on group tendencies] invites a flood of dubious evidence about the motives and characteristics of any number of groups and organizations of which a witness may be a member in order to establish the particular witness was more likely to lie—or tell the truth—on a given occasion . . . .

[7] We note that the detective's discussion of the truthfulness of "excited utterances" at the very least veers dangerously close to the prohibition against one witness opining on the truthfulness of another's testimony. *See State v. Haseltine*, 120 Wis. 2d 92, 96, 352 N.W.2d 673 (Ct. App. 1984). Though Warmington did not name any particular witness, we are not blind to the fact that he was called to discredit the stories of Jones and other witnesses helpful to Burton.

The possibilities of such testimony are almost endless—involving the characteristics and motivations of various racial, ethnic, professional, and religious groups, as well as organizations as different as the Boy Scouts and the Compton Crips. The law has wisely looked askance at evidence of group tendencies and motives to lie—or tell the truth—when making credibility judgments about individual members of those groups. The relevance of such group tendencies in predicting a witness's credibility on a given occasion is extraordinarily weak. Meantime the potential prejudice—in favor of certain groups and organizations and against others—is extraordinarily powerful.

*Id.* at 22 (Johnson, J., concurring).[8]

¶ 18. We also find objectionable Warmington's testimony that a gang member who had been "publicly embarrassed" would "feel the need to gain that respect back . . . through retaliation, through physical confrontation, a fight, a shooting." Though Warmington did not mention Burton by name, the whole line of questions and answers is obviously intended as support for the prosecution theory that Burton shot Bowens in retaliation for the alleged robbery; indeed, the prosecution explicitly sought to introduce this testimony to show Burton's motive. As Burton points out, the State adduced no evidence that he was in any gang, and thus as a matter of logic, Warmington's testimony about how gang members would feel and act, even if true, was not

---

[8] There is no denying the existence of a "no snitching" ethic in some tough neighborhoods, along with a tendency to rely on personal confrontation, rather than police, to solve problems. *See* Eugene Kane, *This Professor's Opinions Have "Street Cred,"* MILWAUKEE JOURNAL SENTINEL, Oct. 13, 2007 at 3B. The roots of these phenomena are more complex than the simple presence of gangs, however. *See id.*

relevant to show how Burton felt and acted.[9] This alone would be reason to exclude it, but the larger problem is that the testimony encouraged the jury to supply the logical link on its own and to connect Burton with the "gang culture" Warmington described. Burton's trial counsel put it well while arguing that Warmington should be voir dired:

> What bothers me is that it is unfair to my client to necessarily lump him in with all of this and to do it in a way that disparages his character. It's one thing to say Mr. Burton was caught up in the subculture that we're dealing with in this trial. It's another thing to label him in a pejorative manner by aligning him to the culture itself.... There is a difference between living in the ghetto and creating the ghetto. There is a difference between living among gang members and promoting the gang culture, and that is where they're stepping over the line.

¶ 19. So, of the three aforementioned elements of discretion (inferences derived from facts of record, the exercise of appropriate logic and the use of applicable case law), the trial court's determination failed on each of these three levels. First, Warmington implied that Burton—who he admitted was not a gang member—was beholden to the gang culture, as were the other witnesses, simply by virtue of the fact that he and the witnesses lived in the same neighborhood as gang

---

[9] The State claims that there was evidence that Burton was "affiliated" with gangs "in the sense of virtually being at war with one Vice Lords chapter over mutual affronts to dignity." But the record cites the State provides are to statements by defense counsel and by the court at pretrial hearings, statements and questions by both parties at pretrial voir dire, and the prosecutor's opening argument. None of these statements or questions constitutes evidence.

417

members. As we have shown, his conclusion was premised on the unsupported inference that those who live in troubled neighborhoods will conduct themselves like gang members, both on the streets and in the courtroom. The trial court misused its discretion on one level by buying into this defective syllogism and accepting this faulty inference which was *not* derived from any *facts* of record. And, on another level, the trial court also demonstrated a faulty exercise of logic by buying into the syllogism. The determination fails on the third level as well. The decision expanded the applicable case law (*Long*, 255 Wis. 2d 729, ¶ 19) well beyond the reasoning employed in *Long* and without sound basis to do so. In sum, all three components of the discretionary standard were violated here. As such, it was an erroneous exercise of discretion for the circuit court to admit the testimony. *See Ocanas*, 70 Wis. 2d at 185.

■

¶ 20. The State nevertheless argues that any error was harmless. *See* Wis. Stat. §§ 805.18(2), 972.11(1). The State makes two related arguments, the first of which is that the evidence that Burton shot each of the victims was, in the State's view, "overwhelming." On review of the record, we agree that there was a significant amount of testimony to this effect. However, there was no physical evidence specifically linking Burton to the shootings (the gun was never recovered) and there were also several witnesses who contradicted or weakened the State's version of events. That is, of course, one reason the State called Warmington—to attack the credibility of these accounts of the incidents and thereby bolster the credibility of its own version. We cannot hold that his testimony did not contribute to the guilty verdicts. *See State v. Smith*, 203 Wis. 2d 288, 301, 553 N.W.2d 824 (Ct. App. 1996).

¶ 21. The State's second argument is that there could be no unfair prejudice because "the basic facts of the case, and unfortunately the day-to-day life of many of the jurors, were already so laden with violence." We do not deny that the case involved discussion of a great deal of violence by multiple parties, but the entire point of the trial was to determine whether *Burton* perpetrated the violence at issue. As to the familiarity of the jurors in this case with violence, it is not exactly clear to us what this has to do with the question of harmless error. We doubt that the jury was so inured to violence as to be completely unconcerned with the alleged or implied gang connections of witnesses or of the defendant.

*By the Court.*—Judgments reversed and cause remanded.