ZEBROWSKI, Plaintiff in error, v. STATE, Defendant in error.*

*No. State 122. Argued March 5, 1971.—Decided March 30, 1971.*
(Also reported in 185 N. W. 2d 545.)

* Motion for rehearing denied, without costs, on June 2, 1971.

For the plaintiff in error there was a brief and oral argument by *Nathaniel D. Rothstein* of Milwaukee.

For the defendant in error the cause was argued by *William F. Eich,* assistant attorney general, with whom on the brief was *Robert W. Warren,* attorney general.

CONNOR T. HANSEN, J.

Five issues are raised on appeal:

(1) Was there sufficient evidence to establish the defendant's guilt beyond a reasonable doubt?

(2) Did the trial court err in excluding the testimony of two witnesses relating to the claimed amnesia of the defendant?

(3) Did the trial court err in refusing to permit a medical witness' testimony as to whether the wound could have been self-inflicted?

(4) Did the trial court err in refusing to instruct the jury and submit verdicts on manslaughter, homicide by reckless conduct, and homicide by reckless use of a weapon, and in refusing to instruct the jury on accident as a defense?

(5) Did the trial court err in denying defendant's motion for a new trial?

*Sufficiency of the evidence.*

The evidence introduced at the trial established that the defendant and the deceased were homosexuals and had lived together in an upstairs flat in Milwaukee for approximately one year prior to the offense. Two men who occupied the downstairs flat in the same building, Harris and Morris, testified at the trial.

Harris testified that at approximately 1 p. m. on October 6, 1969, the deceased knocked on his door, came in and stated, "I have been stabbed." The deceased laid down on the couch, asked for some ice and a cold towel, and then asked Harris to call an ambulance. Harris testified he called the police and they arrived a few minutes later. The officer looked at the person on the couch and stated he was not alive. Harris told the officer that someone else lived upstairs, and the officer then went upstairs. Harris also testified that he had heard an argument upstairs between 12:30 and 1 a. m. He stated

it sounded like someone was picking something up and throwing it down and that "it sounded like somebody was throwing their body around." He also stated he heard one of the men upstairs ask, "What are you doing?" He heard the upstairs door open and then the knock on his door.

Morris testified that the noise upstairs started at about 9 or 9:30 p. m., and that there were loud, heavy thumps on the floor. He testified that he went to bed at approximately 10:30 p. m. and that he was not awake when the deceased entered the room nor when the police arrived.

Police Officer Strehlow testified that he arrived at the scene of the offense shortly after 1:05 a. m., along with Officer Bacich. He stated that they were admitted to the downstairs flat by Harris and asked him what had happened and where the man had come from. Upon being told that the man lived upstairs, he went up there. The door upstairs was answered by the defendant, who was holding a knife in his hand. He testified that he asked the defendant to put the knife down; told him there was a man downstairs who had been stabbed; and asked him what had happened. He stated the defendant told him that the man downstairs was his boyfriend; that they had been at a tavern earlier that evening and then came home and went to bed; that the deceased got up and stated he was going to leave, and that he had begged him not to leave; that the deceased headed for the door and he ran to the kitchen, took a knife and ran back to the front door. Officer Strehlow testified that the statement stopped there because his sergeant entered the room, followed by Officer Bacich. At this point, the defendant was placed under arrest and made no further statements to him. He testified that during this conversation, the defendant was crying, was bleary-eyed and smelled of alcohol. He also testified that after the defendant had been taken to

police headquarters and was being escorted to the detective bureau, the defendant asked how Roedl was. Officer Bacich told the defendant that he did not know his condition, but that he had been taken to the hospital. He then heard the defendant say, "He won't press charges anyway; he loves me."

Officer Bacich testified that he arrived at the scene with Officer Strehlow. He stated he heard an officer make a statement that the knife should not be touched, and at that time the defendant stated: "You know my fingerprints are on there; I remember (Donald) standing in the . . . living room with the knife in his chest; (Donald) pulled the knife out of his chest and dropped it on the floor; I picked the knife off of the floor and kept it in my hand. . ." He also testified that the defendant was crying and smelled of alcohol.

Detective Adamczewski, who questioned the defendant at his home at approximately 1:45 a. m., testified that after advising the defendant of his constitutional rights he questioned the defendant for about ten or fifteen minutes. He stated the defendant told him that he and the deceased had dinner that evening at his mother's home and left about 4:45 p. m. They went to a tavern, had about 10 drinks, and returned to their home at about 12:45 a. m. They went to bed and then got into an argument about the deceased's car keys. Detective Adamczewski testified that he then asked the defendant why he stabbed Roedl; that the defendant did not reply and started to cry; and that after crying for about three or four minutes the defendant struck his knee with his fist and stated, "I was his b————, goddamit, and I loved him." He testified that he was unable to ask the defendant any more questions because he was crying. He stated that in his opinion the defendant was sober.

The defendant was then taken to police headquarters and was questioned by Detective Wolf. Detective Wolf

testified that he questioned the defendant at about 3 a. m. for about forty-five minutes to an hour. He advised the defendant of his constitutional rights and told him he was arrested for murder. He testified that the defendant told him the following: He and the deceased left their home at about 5:45 p. m. on October 5th and visited the defendant's mother; they left after a short time and went to a tavern; they stayed there until about 9:30 p. m. and then drove to their apartment. They had a brief argument about the defendant's wanting to borrow Roedl's car keys to go back downtown. Roedl refused to give him the keys and they went to bed. The defendant then became disturbed about the noise downstairs and asked Roedl to go downstairs and tell the people there to quiet down. The defendant watched Roedl go downstairs and tell someone there to turn the stereo down and heard someone tell Roedl they didn't have to. Roedl then returned to the upstairs flat. The defendant was upset because Roedl had not been more aggressive; he went to the kitchen, took out a steak knife and searched for a rifle. Roedl told him not to go downstairs because he would just cause more trouble. The defendant then stated that he didn't remember anything else until he saw Roedl walk out of the apartment and down the stairs. Detective Wolf testified that he then asked the defendant whether he had stabbed the deceased, and that the defendant gave no response.

Two women testified that they had met the defendant and the deceased at a tavern on October 5, 1969, and had observed them there from about 6:30 until 9:30 p. m. Each of them testified that the defendant returned at about 10:30 or 11 p. m. and that they left with the defendant at about 11:30 and went to the defendant's apartment. They had something to eat and drink and left about 12 midnight. They testified that there was no trouble between the defendant and Roedl while they

were there, and that the conversation between them had been friendly. One of the women testified that in her opinion the defendant was intoxicated.

The deceased died of internal hemorrhage due to a stab wound in the chest. The deceased had type AB blood. Tests done on the knife found in the defendant's hand revealed that the blood on it was type AB. There was testimony that persons with type AB blood comprised about five percent of the total population of the country.

The defendant did not testify in his own behalf.

The defendant now contends that the evidence of his guilt was circumstantial, and that the state failed to prove the element of intent requisite for a conviction of first-degree murder. Defendant argues that the record is devoid of evidence of animosity between the defendant and the deceased and shows rather that the two men got along amicably.

This court has held that circumstantial evidence can be as forceful as eyewitness testimony and can form a rational basis for conviction. *State v. Davidson* (1969), 44 Wis. 2d 177, 199, 170 N. W. 2d 755. The defendant told the investigating officer that he had a knife and advanced toward the deceased. He was found a short time later with the knife in his hand. The requisite intent can be inferred from the act of stabbing the deceased alone. The defendant is presumed to intend the natural and probable consequences of his act. *Gelhaar v. State* (1969), 41 Wis. 2d 230, 243, 163 N. W. 609. There was no evidence in this case to rebut that presumption. There was ample evidence on the basis of which the jury could have concluded that the defendant stabbed Roedl during a quarrel. One of the neighbors who lived downstairs testified that earlier that night he had heard quite a bit of noise upstairs: "Loud, heavy thumps on the floor . . . yelling,

so forth." The other downstairs neighbor heard the two men arguing between 12:30 and 1 a. m., shortly before the deceased appeared at his door wounded, and stated that he had been stabbed. The first of several inconsistent statements that the defendant gave to the investigating police officers was that before he went to the kitchen and took the knife, the deceased had threatened to leave and the defendant had begged him to stay.

The test of sufficiency of evidence on review is stated in *Lock v. State* (1966), 31 Wis. 2d 110, 114, 115, 142 N. W. 2d 183:

"We have said many times that when the question of the sufficiency of the evidence is presented on appeal in a criminal case the only question for this court is whether the evidence adduced, believed and rationally considered by the jury, was sufficient to prove the defendants' guilt beyond a reasonable doubt. *State v. Johnson* (1960), 11 Wis. (2d) 130, 137, 104 N. W. (2d) 379; *State v. John* (1960), 11 Wis. (2d) 1, 103 N. W. (2d) 304; *Parke v. State* (1931), 204 Wis. 443, 235 N. W. 775; *State v. Stevens* (1965), 26 Wis. (2d) 451, 132 N. W. (2d) 502. . . . The test is not whether this court is convinced of the guilt of the defendant beyond a reasonable doubt but whether this court can conclude the trier of the facts could, acting reasonably, be convinced to the required degree of certitude by the evidence which it had a right to believe and accept as true.

". . . Stating the rule conversely for the sake of clarity, the evidence when considered most favorably to the state and the conviction must be so insufficient in probative value and force that it can be said as a matter of law that no trier of the facts acting reasonably could be convinced to that degree of certitude which the law defines as 'beyond a reasonable doubt.' "

In this case there was sufficient evidence that the jury, acting reasonably, could be convinced of the defendant's guilt beyond a reasonable doubt.

## Exclusion of testimony concerning defendant's amnesia.

The defendant offered the testimony of two medical witnesses to the effect that the defendant had a hysterical personality and that such personality was consistent with amnesia that could be triggered by a traumatic event such as the death of a loved one. The purpose of the testimony was to rebut the inference of guilt from statements made by the defendant to investigating officers that he was unable to remember certain of the events at the time the deceased was stabbed. The trial court ruled that there was no issue concerning the testimonial trustworthiness of the statements against interest and thus the testimony offered would be irrelevant and immaterial in view of the general plea of not guilty.

This court has adopted the definition of relevancy in Wharton's Criminal Evidence. *Oseman v. State* (1966), 32 Wis. 2d 523, 526, 145 N. W. 2d 766; *Berg v. State* (1969), 41 Wis. 2d 729, 739, 165 N. W. 2d 189. That definition was recently expanded to read as follows:

"Evidence is relevant when it is persuasive or indicative that a fact in controversy did or did not exist because the conclusion in question may be logically inferred from the evidence. The criterion of relevancy is whether or not the evidence adduced tends to cast any light upon the subject of the inquiry. Evidence of any fact is admissible as relevant which might establish the hypothesis of innocence, or show the defendant's guilt. Any evidence that assists in getting at the truth of the issue is relevant; in other words, any fact which tends to prove a material issue is relevant, even though it is only a link in the chain of facts which must be proved to make the proposition at issue appear more or less probable. As a starting point, all facts affording a reasonable inference as to either innocence or guilt are relevant and admissible. To be relevant, it is not necessary that the evidence be conclusive as to guilt

or innocence; and it is sufficient that it tend to convince that the fact sought to be established is so. Relevancy is not determined by resemblance to, but by the connection with, other facts." 1 Wharton's, Anderson, *Criminal Evidence* (12th ed.), pp. 284–287, sec. 148.

Detective Wolf testified that the defendant stated he could not remember what had happened between the time he had the knife in his hand and he saw the deceased walk down the stairs. This stated inability to remember, if feigned, gives rise to a reasonable inference of guilt. The inability to remember, if real rather than feigned, however, does not give rise to such an inference. Thus the proof offered tended to rebut the inference of guilt inherent in the statement of the defendant that he was unable to remember, and indirectly related to the innocence or guilt of the defendant.

In *Whitty v. State* (1967), 34 Wis. 2d 278, 294, 149 N. W. 2d 557, this court adopted Rule 303 of the American Law Institute *Model Code of Evidence* which allows the trial court to exclude relevant evidence when it concludes that the probative value of the evidence is outweighed by the risk that its admission will:

" ' . . . .
" '(a) necessitate undue consumption of time, or
" '(b) create substantial danger of undue prejudice or of confusing the issues or of misleading the jury, or
" '(c) unfairly surprise a party who has not had reasonable ground to anticipate that such evidence would be offered.' "

However, this court has held that in reviewing an alleged error of the trial court in excluding relevant evidence it will not consider these factors as a basis for excluding relevant evidence unless there is an indication in the record that the trial court's discretion has been exercised; and the basis for the exercise of discretion is set forth in the record. *Berg v. State, supra; State v. Hutnik* (1968), 39 Wis. 2d 754, 159 N. W. 2d

733. In this case, there is no indication in the record that the evidence was excluded in the exercise of the trial court's discretion pursuant to Rule 303 of the *Model Code of Evidence.*

The testimony could have been excluded as irrelevant on the basis that it was so inconclusive and speculative as to have no probative value. On direct examination, in the offer of proof, the doctor testified only that on the basis of his examination of the defendant's personality and psychology, assuming that the deceased was stabbed and that the inconsistent statements attributed to the defendant were made by him to the investigating officers, the stated inability of the defendant to recall the event was consistent with amnesia. On cross-examination, he testified that he examined the defendant too long after the event and was unable to form an opinion as to whether the defendant was amnesic or not at the time he made the statement to the officer. He stated it was unlikely that the defendant would have made a true statement at that time whatever his condition of mind, and that he could either have forgotten or could have been lying. Thus the testimony had no tendency to establish whether the claimed inability of the defendant to remember was real or whether it was feigned, and had no tendency to rebut any inference of guilt raised by the defendant's inability to remember. The medical opinion testimony to have any probative value should at least advise the jury that one of the two alternatives was more probably correct.

Assuming that the trial court erred in excluding the testimony, the error was harmless. This court has held that errors occurring in the course of a trial will not serve to overturn a conviction unless it clearly appears that had they not occurred, the result would probably have been more favorable to the defendant. *Woodhull v. State* (1969), 43 Wis. 2d 202, 168 N. W. 2d 281; *Blackwell v. State* (1969), 42 Wis. 2d 615, 167 N. W. 2d

587. Not only was the offered testimony vague and speculative as to whether the claimed amnesia was real, but in addition amnesia is not a legal defense to the crime. There was credible evidence that the defendant stabbed the deceased. The defendant could be found guilty of murder whether or not he was later able to remember stabbing the deceased.

### Exclusion of testimony regarding possibility of self-inflicted wound.

The county medical examiner testified concerning the autopsy she performed on the deceased. Among other things, she stated that the examination of the deceased revealed a stab wound in the upper left side and that the cause of death was internal hemorrhage due to a stab wound in the heart. On cross-examination by defense counsel, the witness was asked whether, assuming the deceased had stabbed himself in the chest, there was anything in the direction of the wound that was inconsistent with a self-inflicted wound. The trial court sustained an objection to the form of the question. The state contends the objection was properly sustained because there was no foundation in the record to support a theory of suicide.

The general rule in criminal cases concerning hypothetical questions put to an expert, on direct examination, is that the question must be based on facts in evidence.

". . . A hypothetical question put to an expert on direct examination must be based on facts in evidence, or conform to tendencies of the evidence. An expert cannot be asked as to a hypothesis having no foundation in the evidence in the case. . . ." 2 Wharton's, Anderson, *Criminal Evidence* (12th ed.), p. 351, sec. 523.

However, the rule is not applicable to questions eliciting the opinions of experts on cross-examination. On cross-

examination, the expert may be asked for an opinion on other possible theories, and assuming facts not in evidence.

". . . The adverse party may then on cross-examination submit to the expert questions based on the theories for which he contends, and the case is then submitted to the jury to determine what theory, if any, is warranted by the evidence.

". . .

"The limitation that hypothetical questions must be restricted to matters in evidence does not apply to the use of such questions on cross-examination when the purpose is to test the value and accuracy of the opinions expressed. The range of such examination is left largely to the discretion of the trial court." 2 Wharton's, Anderson, *Criminal Evidence* (12th ed.), supra, pp. 352, 353, sec. 523.[1]

This court has held that greater latitude and liberty are allowed in the cross-examination of an expert witness and that the degree and manner of cross-examination in criminal cases are matters lying largely in the discretion of the trial court. *Simpson v. State* (1966), 32 Wis. 2d 195, 145 N. W. 2d 206.

However, assuming, without so deciding, that the witness' answer to the question was erroneously excluded, the error was harmless. There was no evidence to support a finding that Roedl took his own life, and there was an abundance of evidence supporting the jury's verdict of murder. Thus, the excluded testimony had no effect upon the outcome of the case.

*Refusal of instructions and verdict on lesser offenses and accident.*

The trial court instructed the jury and submitted verdicts on first- and second-degree murder but refused

---

[1] *See* 23 C. J. S., *Criminal Law*, p. 495, sec. 888.

defendant's requests for instructions and verdicts on manslaughter, homicide by reckless conduct, and homicide by negligent use of a weapon. The trial court also refused defendant's request for an instruction on accident as a defense.

This court has held that the trial court is justified in giving instructions and submitting verdicts on lesser offenses on homicide only where there is reasonable basis in the evidence for a conviction of the lesser offense and for an acquittal of the greater charge. *Weston v. State* (1965), 28 Wis. 2d 136, 135 N. W. 2d 820; *Williamson v. State* (1966), 31 Wis. 2d 677, 143 N. W. 2d 486; *State v. Melvin* (1970), 49 Wis. 2d 246, 252, 181 N. W. 2d 490.

In *State v. Carter* (1969), 44 Wis. 2d 151, 170 N. W. 2d 681, this court held that instructions and verdicts on lesser offenses should be submitted where there is evidence for a conviction on the lesser offense and there is no reasonable ground on the evidence for a conviction on the greater offense. *See also: Commodore v. State* (1967), 33 Wis. 2d 373, 147 N. W. 2d 283.

In this case there was no evidence to support a conviction on the lesser offenses or to support a finding that the stabbing was accidental. The manslaughter instruction requested in this case involved heat of passion and self-defense. This court has held that the heat of passion which will reduce murder to manslaughter, requires provocation such that the homicide is committed under extreme emotional disturbance for which there is a reasonable explanation or excuse. The heat of passion must be caused by reasonable provocation and must so overcome the exercise of judgment as to cause the defendant to act from impelling force of the disturbing cause. *State v. Hoyt* (1964), 21 Wis. 2d 284, 128 N. W. 2d 645; *Weston v. State, supra.* In this case, no

evidence was offered that the defendant's action was provoked or that any provocation had the effect on his state of mind of rendering "heat of passion" a legal defense. Nor was there any evidence that the defendant acted in self-defense, using unnecessary force, or otherwise.

Both homicide by reckless conduct and homicide by negligent use of a weapon are involuntary homicides, involving either negligence or recklessness. Secs. 940.06 and 940.08, Stats. There was no evidence that the death of the deceased was either negligently or recklessly caused. Nor was there evidence to rebut the intent presumed from the reasonable and probable consequences of the defendant's acts. *Gelhaar v. State, supra.* Therefore, the trial court did not err in refusing to give the instructions or submit the verdicts requested by the defendant.

## *New trial in the interest of justice.*

The defendant contends he is entitled to a new trial in the interest of justice because of multiple errors committed at the trial. However, errors occurring in the course of a trial are not grounds for a new trial unless they are prejudicial in the sense that they affected the outcome of the case. *White v. State* (1970), 45 Wis. 2d 672, 681, 173 N. W. 2d 649; *State v. Heidelbach* (1971), 49 Wis. 2d 350, 182 N. W. 2d 497.

"For the defendant to prevail in his contention in regard to any of these alleged errors or in respect to these errors when considered together, it would be necessary for this court to concluude that, had the alleged errors not been committed or the alleged misconduct not occurred, the defendant would probably have been acquitted. Viewing the evidence in its totality, such a result would be highly unlikely. We stated in *Commodore v. State* (1967), 33 Wis. 2d 373, 383, 147 N. W. 2d

283, the standard to be applied in determining whether to order a new trial in the interest of justice. We said:

" 'This power is exercised with "some reluctance and with great caution" and only in the event of a probable miscarriage of justice. *Ferry v. State* (1954), 266 Wis. 508, 511, 63 N. W. (2d) 741. Such grave doubt must exist regarding a defendant's guilt to induce the belief that justice has miscarried. *State v. Fricke* (1934), 215 Wis. 661, 667, 255 N. W. 724. In *Lock v. State* (1966), 31 Wis. (2d) 110, 118, 142 N. W. (2d) 183, we stated:

" ' "In order for this court to exercise its discretion and for such a probability [of a miscarriage of justice] to exist we would at least have to be convinced that the defendant should not have been found guilty and that justice demands the defendant be given another trial." ' " *Berg v. State, supra,* page 746.

We are not so convinced in this case, and the judgment and order of the trial court are affirmed.

*By the Court.*—Judgment and order affirmed.