COURT OF APPEALS
DECISION
DATED AND FILED

August 9, 2022

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.    **2019AP1271-CR**

**STATE OF WISCONSIN**

Cir. Ct. No. **2013CF136**

**IN COURT OF APPEALS
DISTRICT III**

STATE OF WISCONSIN,

    PLAINTIFF-RESPONDENT,

  V.

JACKIE E. LOTT,

    DEFENDANT-APPELLANT.

---

APPEAL from a judgment and an order of the circuit court for Brown County:  DONALD R. ZUIDMULDER, Judge.  *Affirmed*.

Before Stark, P.J., Hruz and Gill, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1    PER CURIAM.   Jackie Lott, pro se, appeals a judgment of conviction for second-degree sexual assault, incest, and administering a stupefying drug, as

well as an order denying his motion for postconviction relief. Lott argues that the circuit court erred in preventing his attorney from eliciting certain testimony from an expert witness during cross-examination, that the real controversy was not fully tried, and that he was deprived of the right to present a defense. We reject Lott's arguments and affirm.

## BACKGROUND

¶2      Lott was charged with second-degree sexual assault for having intercourse with a victim known to be unconscious, incest, and administering a stupefying drug with the intent to facilitate a crime. At trial, Darlene,[1] Lott's blood relative, testified that she was at home watching a movie late at night with Lott. She was half asleep when she felt a finger in her mouth and Lott put three pills in her mouth. He then gave her a drink of water and she went back to sleep. When Darlene woke up, Lott was behind her engaging in sexual intercourse with her.

¶3      The jury also heard testimony from fourteen other witnesses, including Darlene's mother, responding officers, the nurse who conducted the sexual assault examination, and two employees of the State Crime Laboratory. Sherry Culhane, a forensic DNA analyst, testified that the sperm from Darlene's vaginal swab matched Lott's DNA and that Darlene's DNA was found on penile swabs taken from Lott. Michael Larson, a toxicologist, testified that diazepam was found in Darlene's blood and urine samples. The jury also heard from Lott's orthopedic surgeon, who testified that he had performed arthroscopic knee surgery on Lott and that he routinely prescribed diazepam for post-operative patients.

---

[1] Pursuant to the policy underlying WIS. STAT. RULE 809.86 (2019-20), we use a pseudonym when referring to the victim and also omit other personally identifying details. All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

¶4      Lott testified in his own defense, denying that he had sex with Darlene or that he put any drugs in her mouth. Lott testified that on the night in question, he had fallen asleep on the couch and then woke up alone and confused. As he was looking for Darlene, the police arrived. Lott stated that he had "[n]o idea" why Darlene's DNA ended up on his penis and that he had no recollection of anything that happened. Lott also testified that he had "a lot" of prescription drugs in his home, including diazepam.

¶5      The jury convicted Lott of all three counts. On the sexual assault charge, the circuit court sentenced Lott to fifteen years of initial confinement followed by ten years of extended supervision. The court withheld sentence on the remaining two charges and imposed five years of probation, to run consecutively to his sentence on the sexual assault charge.

¶6      Lott filed a postconviction motion, alleging numerous trial errors as well as claims of ineffective assistance of counsel. The circuit court denied his motion without a hearing. Lott now appeals, focusing only on the court's refusal to allow his trial attorney to elicit certain hypothetical testimony from Larson during cross-examination.

¶7      Lott's arguments center on the levels of diazepam and metabolites that were detected in Darlene's blood and urine samples, and whether those levels were consistent with a dose that would have rendered Darlene unconscious at the time of the sexual assault. Specifically, Larson testified that the level of diazepam in Darlene's blood was less than fifty micrograms per liter. Larson further testified that diazepam is typically prescribed in tablets of two, five, or ten milligrams, and that blood concentrations for therapeutic levels of diazepam range from 20 micrograms to 4,000 micrograms per liter.

3

¶8  During cross-examination, Lott's trial attorney sought to elicit testimony from Larson about whether the level of diazepam detected in Darlene's blood was consistent with a dose strong enough to render her unconscious. The attorney first asked Larson, "[B]ased on the numbers … is it likely that the diazepam was strong enough to have knocked [Darlene] unconscious?" Larson responded, "I can't say likely. I can say possibly." After a sidebar discussion, Lott's trial attorney elicited additional testimony from Larson that blood concentration levels usually peak between thirty minutes and two and one-half hours after a person takes diazepam, depending on the dose. Larson then explained that diazepam is a moderate sedative, with an onset effect that typically occurs within twenty or thirty minutes, with the duration of the effect dependent on a person's blood level concentration.

¶9  At that point, Lott's trial attorney asked, "Let's talk about levels in general. Isn't it true that if somebody took a single oral dose of diazepam of 10 milligrams, at their peak time they'd be showing a concentration of about 300 to 800 micrograms per liter?" The prosecutor objected, on the grounds that the question called for speculation and was not relevant. The circuit court stated that Larson could answer if it was within his expertise. Larson testified that he was able to answer.

¶10  Lott's trial attorney then varied the question slightly, asking Larson whether "somebody who takes a single oral dose of diazepam at 10 milligrams would be showing a concentration of about 300 micrograms per liter to 800 micrograms per liter at the peak time of a half hour to two hours." This time, the circuit court sustained the prosecutor's objection on relevancy grounds, explaining that "there's nothing in this record that talks about taking a single pill, and therefore, this question isn't relevant to anything that's in [this] case." The court invited Lott's

trial attorney to rephrase the question, at which point counsel asked, "How about three pills of 5 milligrams apiece, typically what would a peak level show?"

¶11    Larson explained that the answer depended on many factors, including the dose of the pill, the individual's body weight, and the individual's volume of distribution. Larson further testified that "the problem with diazepam is the volume of distribution is not typically known, and it shows a lot of variation. So … two people with the same body weight take the same dose, they can have vastly different blood concentrations of a pretty wide range." Nonetheless, Larson testified that he could use a calculator to figure out the expected range of blood concentration for a dose of fifteen milligrams.

¶12    At that point, the circuit court revisited the prior objection, explaining that Larson's testimony was relevant if he was in a position to opine about the effect of that level of dosage. But the court also expressed concern that "if we're going to go through all this and then he basically testifies that because of all these variables he can't say how it would affect any individual, then I don't see how it's relevant." Lott's trial attorney then asked Larson if, after doing the calculations, he would be "able to tell us the effects that that level would have on a person." Larson responded that he would not be able to provide a specific answer.

¶13    Lott's trial attorney requested another sidebar, but the circuit court explained, "[H]ere's the other problem … [Y]ou're assuming a fact not in my record." The court pointed to Larson's prior testimony that diazepam typically comes in dosages of two, five, or ten milligrams and explained that there was no basis in the record for assuming that Darlene had received any particular dose. The court then said, "So with that, you can—but you may continue asking him any questions. Go ahead."

5

¶14    The following exchange then occurred:

Q: Okay. If the dose in question had been taken between 2:50 a.m. and 3:25 a.m., on that day, she'd have been peaking soon afterwards, correct?

A: Which dose are you talking about now, the 15 milligram?

Q: I'm—I'm not permitted to talk about actual dosages. I'm talking about at any dose.

THE COURT: Well, it's not that you're not permitted to talk about it. It's that there's nothing in my record that—that may permit you to characterize what the quantity was.

Q: At any dose would somebody be peaking around a half hour after taking the dose?

A: Between a half an hour and 2.5 hours is in the literature.

¶15    After further testimony from Larson about the long and varied half-life of diazepam and the imprecisions involved in attempting to do a retrograde calculation of dosage based on blood concentration levels, Lott's trial attorney asked, "[D]o the levels that you find and the metabolites you find indicate that the dosage was taken recently or could it have been taken a day, two days beforehand?" Larson responded that "[b]oth scenarios are possible."

## DISCUSSION

¶16    Lott makes three main arguments relating to the circuit court's decision to exclude Larson's testimony about the hypothetical ten milligram dose: (1) that the court erroneously exercised its discretion in excluding the specified testimony; (2) that we should exercise our discretionary reversal power

because the real controversy in the case was not fully tried; and (3) that he was denied his constitutional right to present a defense.[2]

### I.    Erroneous Exercise of Discretion

¶17    "The determination of whether an expert's testimony will assist the fact finder to understand the evidence or to resolve a fact in issue 'is a discretionary decision of the [circuit] court.'" *State v. Long*, 2002 WI App 114, ¶25, 255 Wis. 2d 729, 647 N.W.2d 884 (citation omitted).  We will uphold the court's discretionary decision "if it examined the facts of record, applied a proper legal standard and employed a rational process to reach a reasonable conclusion." *Id.*

¶18    Lott's first argument is that the circuit court erroneously exercised its discretion "when it excluded expert testimony regarding the concentration levels of a 10 mg dose of diazepam."  In particular, Lott argues that the court

> failed to examine the facts of the record and also applied an improper legal standard when it determined that because there was no testimony in the record regarding the quantity of the pills taken counsel was not permitted to ask hypothetical questions regarding the concentration levels of a 10 mg dose of diazepam.

Lott points out that Wisconsin law permits hypothetical questions in cross-examining expert witnesses in criminal cases.  *See State v. Berg*, 116 Wis. 2d 360,

---

[2] Lott's arguments rely in part on a letter from Dr. Steven Lagman, an anesthesiologist, regarding the effects of diazepam.  In Lott's reply brief, he contends that because the State did not address this letter, it has conceded the point made in that letter.  This letter was included as part of a separate appendix that was stricken from the record along with Lott's brief because they referred to the victim by name.  Lott submitted a revised brief shortly thereafter, and the table of contents states that it includes an appendix.  The brief does not incorporate Dr. Lagman's letter, and Lott did not resubmit a separate appendix.  Because this letter is not part of the record before us, we do not address it.  Even if the appendix were part of the record, a party's appendix may not be used to supplement the appellate record.  *See Reznichek v. Grall*, 150 Wis. 2d 752, 754 n.1, 442 N.W.2d 545 (Ct. App. 1989).

368, 342 N.W.2d 258 (1983) ("A proper hypothetical may elicit an expert's opinion on material facts of the case because of the safeguards that the opposing party may supply omitted facts and the court may require questions to be rephrased.").  In addition, our supreme court has explained that more latitude is permitted on cross-examination, where "the expert may be asked for an opinion on other possible theories, and assuming facts not in evidence." *Zebrowski v. State*, 50 Wis. 2d 715, 727, 185 N.W.2d 545 (1971).[3]  Lott contends that "[t]estimony from Lott that he was prescribed 5 mg tablets of diazepam would have provided the missing link."

¶19     We see three problems with this argument.  First, the specific question that drew the objection was whether Larson could opine on the effects of "a single oral dose of diazepam of 10 milligrams."  The circuit court understood the hypothetical question to be based on *one* pill with a dose of ten milligrams, and it sustained the objection because "there's nothing in this record that talks about taking a single pill, and therefore, this question isn't relevant to anything that's in [this] case."  Lott's argument that he was prepared to testify to having access to five milligram pills does nothing to bridge the gap between the question posed and the facts in the record.

¶20     Second, even if we assume that there is no difference in effect between a single ten milligram pill versus two five milligram pills that are taken together, Darlene testified that she felt three pills in her mouth.  So, even if Lott had testified that he had access to five milligram pills, there would still be a disconnect between

---

[3] Lott identified the more generous standard in *Zebrowski v. State*, 50 Wis. 2d 715, 727, 185 N.W.2d 545 (1971), for the first time in his reply brief.  Ordinarily we do not consider arguments made for the first time in a reply brief, but we may exercise our discretion to do so in the interest of providing guidance. *See State v. Reese*, 2014 WI App 27, ¶14 n.2, 353 Wis. 2d 266, 844 N.W.2d 396.

the record evidence and the expert's opinion about the effects of a ten milligram dose.

¶21    Lott argues that expert testimony about the effects of a ten milligram dose would be relevant to evaluating his proposed evidence that Darlene received a fifteen milligram dose, both in terms of evaluating Darlene's credibility and evaluating the effect that such a dose would have had on Darlene.  Even if we accept Lott's attenuated argument for why testimony about a ten milligram dosage would have been relevant, it would have been unnecessarily confusing for the jury to hear testimony about a dose that was wholly inconsistent with the facts of record.  *See* WIS. STAT. § 904.03 (relevant evidence may be excluded if its "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.").

¶22    Third, when Lott's trial attorney asked Larson about three five milligram pills—which, if we understand Lott's argument, is a more relevant hypothetical question than the ten milligram hypothetical on which Lott focuses— Larson was unable to opine about how that dosage would have affected any specific individual.  To the contrary, Larson testified that the blood concentration of diazepam varies widely depending not only on dosage and an individual's body weight, but also on an individual's volume of distribution, which "is not typically known, and … shows a lot of variation."  At best, Larson was prepared to testify that individuals could have "vastly different concentrations of a pretty wide range." Similarly vague testimony about a ten milligram dose would have been needlessly cumulative, especially because there was no evidence that Darlene had received a ten milligram dose.

9

¶23 Finally, even assuming that the circuit court erred in not permitting this line of questioning, we can easily conclude that the error was harmless. *See State v. Hunt*, 2014 WI 102, ¶26, 360 Wis. 2d 576, 851 N.W. 2d 434 ("The erroneous exclusion of testimony is subject to the harmless error rule."). An error is harmless "if it is 'clear beyond reasonable doubt that a rational jury would have found the defendant guilty absent the error.'" *Id.* (citation omitted). Here, Darlene's testimony coupled with the forensic DNA evidence presented a compelling case for Lott's guilt, such that it is clear beyond reasonable doubt that Lott would have been convicted of all three counts even with Larson's testimony about the range of effects of a purely hypothetical dose of diazepam.

¶24 Lott contends that the excluded testimony would have helped him to discredit Darlene and make her less credible to the jury. But the jury had already heard much stronger testimony from Larson that could have discredited Darlene's version of events. For example, the jury heard that the normal blood concentration for a therapeutic dose of diazepam was between 20 milligrams and 4,000 milligrams and that Darlene's blood concentration of less than 50 milligrams was on the lowest end of the detectable range. The jury also heard Larson's testimony that Darlene's blood concentration made it "possible" but not "likely" that the pills caused her to lose consciousness. Finally, the jury heard that it was possible that the diazepam and metabolites found in Darlene's blood and urine could have been from a dose taken a day or two earlier. Despite all of this testimony casting doubt on Darlene's version of events, the jury chose to believe her. We are therefore confident that the outcome would not have been different with Larson's inconclusive testimony about the wide range of effects that a purely hypothetical diazepam dose might have had on Darlene.

## II.    Discretionary Reversal Power

¶25    Lott's second argument is that we should exercise our discretionary reversal power to order a new trial because "the real controversy was not fully tried." We exercise our power of discretionary reversal "in exceptional cases" including "when it is probable that justice has miscarried and justice requires that the evidence be presented to a new trier of fact for a verdict." *See State v. Kucharski*, 2015 WI 64, ¶¶23, 25, 363 Wis. 2d 658, 866 N.W.2d 697.

¶26    Lott contends that "the jury which found [him] guilty did not have an opportunity to hear and evaluate evidence of expert witnesses that raises doubt on whether [Darlene] was drugged and whether she was unconscious as a result of the drugs." Lott is incorrect. As explained above, the jury heard plenty of testimony from Larson that cast doubt on Darlene's version of events.

¶27    Lott further argues that Larson's testimony "bore on the critical issue of whether [Darlene] was unconscious as a result of being drugged." The State disputes that the question of whether Darlene was unconscious as a result of being drugged was a critical issue in the case because none of the elements of any of the charges required the State to make that specific connection. The incest charge required only that Lott had sexual intercourse with a person who Lott knew to be related to him by blood such that marriage would be prohibited by law. *See* WIS JI—CRIMINAL 1532 (2010). Whether Darlene was drugged or unconscious had no bearing on Lott's conviction for this charge.

¶28    The charge of administering a stupefying drug had three elements: (1) that Lott administered a substance to Darlene; (2) that "[t]he substance was poisonous, stupefying, overpowering, narcotic, or anesthetic"; and (3) that Lott "acted with the intent to facilitate a crime." *See* WIS JI—CRIMINAL

11

1352 (2008). Larson's testimony established that diazepam causes sleepiness, drowsiness, and sedation, which is sufficient to establish the second element of a stupefying substance. The remaining elements require evidence only that Lott gave Darlene diazepam with the intent to facilitate his commission of the sexual assault. There is no requirement that the diazepam actually rendered Darlene unconscious. Thus, the issues of why, or whether, Darlene was unconscious at the time of the sexual assault was not critical to Lott's conviction on this charge either.

¶29    On the other hand, the State agrees that the question of whether Darlene was unconscious was relevant to the sexual assault charge. To obtain a conviction on that charge, the State had to prove three elements: (1) that Lott had sexual intercourse with Darlene; (2) that Darlene was unconscious at the time of the sexual intercourse; and (3) that Lott knew that Darlene was unconscious at the time of the sexual intercourse. *See* WIS JI—CRIMINAL 1213 (2002). Nonetheless, the State argues that the reason Darlene was unconscious had no bearing on any of these elements, which were satisfied merely by showing that Darlene had fallen asleep and that Lott knew she was unconscious at the time of the sexual assault. In other words, Darlene's testimony that she fell asleep and then woke up to Lott having sexual intercourse with her was sufficient to satisfy the first two elements.

¶30    Regarding the third element, Darlene's testimony that Lott put three pills in her mouth and gave her a drink of water helped establish that Lott knew that Darlene was unconscious while he was having sexual intercourse with her. Lott argues that the question of whether the diazepam caused Darlene's unconsciousness must therefore be "a fact of consequence." Lott is incorrect: the prosecution argued that Lott drugged Darlene "in an effort to make sure that she remained unconscious throughout the sexual assault." But, the undisputed evidence established that Lott's effort was unsuccessful because Darlene woke up in the middle the assault. Still,

12

Lott's intent in administering a drug that could render Darlene unconscious was sufficient to establish his knowledge that Darlene was unconscious when she fell asleep. Likewise, Darlene's testimony that she fell back asleep after Lott put the pills in her mouth was sufficient to establish that she was unconscious at the time the sexual assault began, even if the three pills were not the reason that Darlene fell back asleep. In sum, evidence regarding whether Darlene's lack of consciousness was actually caused by the drug that Lott administered was not critical to Lott's conviction on the sexual assault charge.

¶31    Regardless, even if Lott were correct that this issue was critical to his conviction on any of these charges, he overlooks the fact that Larson had already testified regarding this particular issue. Specifically, when asked whether the blood concentration of diazepam found in Darlene's blood and urine was consistent with an initial dose that was likely to render Darlene unconscious, Larson responded, "I can't say likely. I can say possibly." Thus, there was testimony bearing on this particular issue. The rest of Larson's testimony made it clear that he was unable to testify with any precision about what effect the diazepam may have had on Darlene at different blood concentrations at the time of the sexual assault. Indeed, Lott's trial attorney asked Larson if there was "any way to extrapolate based on the time and the level that you see in your report what the blood concentration may have been between 2:50 and 3:25 a.m." Larson was unable to answer that question and explained that a retrograde extrapolation was "not wise." At best, Larson was prepared to speak generally about the wide range of possible effects of diazepam.

¶32    Lott contends that with Larson's testimony about a hypothetical dose of ten milligrams, "there is a reasonable probability that [the jury] would have had a reasonable doubt respecting whether three pills were forced into [Darlene's] mouth which rendered her unconscious." We disagree that testimony about a

13

hypothetical dosage would have cast additional doubt on Darlene's version of events. Indeed, the jury did hear testimony on this specific issue when Larson testified that it was possible but not likely that the blood concentration in Darlene's blood indicated a dose sufficient to render her unconscious. Likewise, Larson also testified that the levels of diazepam and metabolites found in Darlene's blood and urine could have been a result of pills taken a day or two earlier. Finally, Larson testified that the results showing the presence of diazepam in Darlene's blood could have been a false positive.

¶33 The jury disregarded each of these possibilities when it found Lott guilty of administering a stupefying substance. Instead, the jury believed Darlene's testimony that she felt Lott putting three pills in her mouth, and she thereafter fell back to sleep. Under the circumstances, we are confident that vague and unspecific testimony about the possible range of effects of a ten milligram dose would not have affected the outcome. We therefore decline to exercise our discretionary reversal power.

### III. The Constitutional Right to Present a Defense

¶34 Lott's final argument is that he was denied the constitutional right to present a defense due to the exclusion of "evidence regarding the concentration levels of a 10 milligram dose of diazepam." *See* ***State v. St. George***, 2002 WI 50, ¶¶47-48, 252 Wis. 2d 499, 643 N.W.2d 777 (evaluating whether the circuit court's decision to exclude testimony from the defendant's expert denied the defendant his constitutional right to present a defense). In *St. George*, our supreme court set forth a two-part test for determining whether a circuit court's decision to exclude expert testimony denied a defendant the right to present a defense. *Id.*, ¶¶53-55. At the first step, the defendant must make an offer of proof that satisfies four factors:

> 1. The testimony of the expert witness met the standards of WIS. STAT. § 907.02 governing the admission of expert testimony.
>
> 2. The expert witness's testimony was clearly relevant to a material issue in this case.
>
> 3. The expert witness's testimony was necessary to the defendant's case.
>
> 4. The probative value of the testimony of the defendant's expert witness outweighed its prejudicial effect.

*St. George*, 252 Wis. 2d 499, ¶54. If the defendant satisfies this first part of the test, the court "determin[es] whether the defendant's right to present the proffered evidence is nonetheless outweighed by the State's compelling interest to exclude the evidence." *Id.*, ¶55.

¶35    Lott argues that we should find that the first step's four factors are satisfied here because "his only line of defense was to demonstrate how scientific evidence proves [Darlene] was lying when she claimed to have been rendered unconscious immediately as a result of three pills being forced into her mouth." For the reasons discussed above, we disagree that questions about an admittedly hypothetical dosage could have proven that Darlene was lying.

¶36    Moreover, Larson's testimony about the potential effects of a hypothetical dosage was not "necessary" to Lott's defense because Lott already had much stronger evidence that discredited Darlene's version of events. As we explained above, the jury heard plenty of evidence that cast doubt on whether Darlene's blood concentration levels were consistent with ingesting three diazepam pills a few hours earlier. Nonetheless, the jury chose to believe Darlene's testimony on these issues.

¶37    Lott also argues that, as part of his defense, he could have testified that "the only pills available in the house at the time of the alleged assault were 5 mg tablets of diazepam." Even with this additional testimony, the excluded testimony from Larson would not have been meaningful because the record would still have been devoid of any evidence that Darlene had ingested a ten milligram dose of diazepam, either in the form of one ten milligram pill (as suggested by the hypothetical posed by Lott's attorney) or in the form of two five milligram pills. Thus, the circuit court's decision that Larson could not testify about that specific dosage does not have any bearing on Lott's argument that he could have developed a defense based on his own testimony that he had access to five milligram pills.

¶38    Lastly, even if Lott's trial attorney had pursued a defense theory based on Lott's access to five milligram pills, the remainder of Larson's testimony showed that he was not in a position to offer specific testimony about the effect that any particular dose would have had on Darlene. As Larson explained, diazepam is not like alcohol, which permits more precise retrograde calculations based on blood concentrations. Likewise, Larson explained that it is not possible to provide precise calculations about the effect of a particular dose of diazepam on a person with a particular body weight because "the problem with diazepam is the volume of distribution is not typically known, and it shows a lot of variation. So … two people with the same body weight take the same dose, they can have vastly different blood concentrations of a pretty wide range." Thus, to the extent that Lott was in fact prepared to offer additional testimony about his access to five milligram pills of diazepam, his defense theory was precluded by the nature of diazepam itself and not by the exclusion of any testimony from Larson. For these reasons, we conclude that Lott was not deprived of his constitutional right to present a defense.

*By the Court.*—Judgment and order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.