# COURT OF APPEALS
# DECISION
# DATED AND FILED

## September 3, 2025

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal Nos. **2023AP2364**
**2023AP2365**
**STATE OF WISCONSIN**

Cir. Ct. Nos. **2022TP205**
**2022TP206**

**IN COURT OF APPEALS**
**DISTRICT I**

APPEAL NO. 2023AP2364

IN RE THE TERMINATION OF PARENTAL RIGHTS TO L.M., A PERSON UNDER THE AGE OF 18:

STATE OF WISCONSIN,

      PETITIONER-RESPONDENT,

  V.

M.W.,

      RESPONDENT-APPELLANT.

APPEAL NO. 2023AP2365

IN RE THE TERMINATION OF PARENTAL RIGHTS TO K.M., A
PERSON UNDER THE AGE OF 18:

STATE OF WISCONSIN,

PETITIONER-RESPONDENT,

v.

M.W.,

RESPONDENT-APPELLANT.

APPEALS from orders of the circuit court for Milwaukee County: MARSHALL B. MURRAY, Judge. *Affirmed*.

¶1 WHITE, C.J.[1] M.W.[2] appeals the orders terminating her parental rights to her children Liam and Karen and an order denying her motion for postdisposition relief. M.W. argues that (1) her trial counsel was ineffective when counsel failed to object to multiple instances of hearsay, and (2) her due process rights were violated when the court ruled that she could not introduce evidence that another child remained in her care. For the following reasons, we affirm.

## BACKGROUND

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(e) (2023-24). All references to the Wisconsin Statutes are to the 2023-24 version.

[2] We refer to the family in this matter by initials or pseudonyms to maintain confidentiality and privacy, in accordance with WIS. STAT. RULE 809.19(1)(g).

¶2      M.W. is the mother of six children, two of which, Liam and Karen, are the focus of these appeals. On December 19, 2022, the State filed petitions seeking to terminate M.W.'s parental rights to Liam and Karen, alleging as grounds that (1) M.W. had failed to assume parental responsibility for Liam and Karen, and (2) Liam and Karen were in continuing need of protection and services (continuing CHIPS).

¶3      The termination of parental rights (TPR) petitions alleged that on November 15, 2020, police were dispatched to M.W.'s home where they found M.W. incoherent and unresponsive. At that time, M.W.'s children were in the home with no other adult apparently present. As a result, Liam and Karen were removed from M.W.'s care. On July 29, 2021, Liam and Karen were found to be children in need of protection and services (CHIPS).

¶4      The CHIPS orders required M.W. to fulfill certain conditions in order for Liam and Karen to be returned to her care, which included providing "safe care" for her children, having a "safe, suitable, and stable home," controlling her "alcohol addiction," and not allowing violence in her home or in front of her children. Thus, as part of the TPR petitions, the State alleged that M.W. had failed to meet these conditions within the time frame provided by the CHIPS orders.

¶5      M.W. contested the allegations in the petitions, and the case proceeded to a jury trial beginning August 28, 2023. Prior to jury selection, the State and guardian ad litem (GAL) asked the trial court to preclude M.W. from presenting evidence at trial related to the fact that her youngest child, Thomas (who was born after the events alleged in the petitions occurred) still remained in her care. Counsel for M.W. objected, but the court ruled that evidence of M.W.'s ability to care for Thomas was not relevant to the issues to be decided by the jury.

3

¶6      At trial, Officer John Kleinfeldt testified as to the incident on November 15, 2020, which led to Liam and Karen's removal from the home. He stated that he was dispatched to a medical call at M.W.'s apartment, and when he arrived he found M.W. in the kitchen, intoxicated and unresponsive. He stated that he spoke to M.W.'s older children, John, Sean, and Megan, who reported that M.W. was the only adult in the home at the time. The jury was shown footage of the incident taken by Officer Kleinfeldt's body camera.

¶7      Marvalene Flynn, an initial assessment specialist for the Division of Milwaukee Child Protective Services (DMCPS), also testified. She stated that following the incident on November 15, 2020, she spoke with M.W.'s three older children about what had occurred. She said that, in speaking with John, he said that he and Sean had "heard a loud crash" that was "coming from the kitchen and they saw their mother passed out in the sink." John also purportedly told Flynn that M.W. had a drinking problem, usually drinking all night and sleeping all day and that "he doesn't like when his mother is drinking and wants her to be sober." He also stated when he does see alcohol around the home he pours it in the sink. Flynn further testified that John stated that he often had to care for his younger siblings and chose not to live with his mother because of her drinking.

¶8      Flynn also testified that she spoke to Sean, who similarly stated that this incident was not the first time M.W. had passed out while drinking, and that M.W. "goes crazy" when she drinks. He further stated that he would often have to call his older brother John to bring food for him and his younger siblings because M.W. was passed out. Flynn also testified, over M.W.'s objection, that she spoke to Megan, who confirmed that M.W. "does drink."

¶9 Finally, Flynn testified that "there were calls" in October 2018 and October 2019 alleging that M.W. was drinking alcohol and/or using Adderall. As a result of her investigation, Flynn took temporary physical custody of Liam and Karen.

¶10 M.W. also testified. The State questioned M.W. as to whether she believed she had met the condition to provide safe care for her children. In response, M.W. said, "yes," because "I have a younger child that is living with me. I believe my home is safe." The GAL objected to this testimony, and in response the trial court admonished M.W. that she was not permitted to testify about the child in her home. The court later instructed the jury "not to concern yourselves with any other children you may have heard mentioned or their circumstances."

¶11 The State also called Erin Pechacek, the ongoing child welfare worker. She testified that she was assigned to the cases in November 2020, when M.W. was "dealing with some AODA issues" and there were "concerns about domestic violence." She confirmed that M.W. participated in several services to which she was referred, including random drug testing, AODA treatment, a psychological evaluation, personal therapy, and parenting classes.

¶12 However, Pechacek nevertheless stated that she did not believe M.W. had met the conditions of the CHIPS orders. She testified that in September 2022 there was an incident in which M.W. relapsed and drank alcohol. Pechacek also stated that she spoke with different providers who had mentioned that M.W. continued to not have healthy coping mechanisms and was at a "higher risk for another alcohol related incident." She also felt that M.W. had not properly addressed her history of issues with domestic violence. Pechacek noted that M.W.'s children and the children's foster parents had informed her that M.W. had allowed

her boyfriend, A.N., with whom she had been involved in a domestic violence relationship, to be present during her unsupervised visits with Liam and Karen.

¶13    The jury ultimately found that both grounds for termination existed. The dispositional stage began September 1, 2023, wherein the trial court ultimately found that it was in the children's best interests if M.W.'s parental rights were terminated.

¶14    M.W. subsequently filed a motion requesting a new trial, alleging that she had received ineffective assistance of counsel. M.W. asserted that her trial counsel had failed to object to multiple instances of hearsay testimony at trial. Following a postdisposition hearing, the trial court denied the motion, finding that the statements had not been offered for the truth of the matter asserted, and thus were not hearsay. Instead, the court determined that the statements had been offered either to explain why Liam and Karen had originally been removed from the home, or to explain how M.W. had failed to fulfill the conditions of the CHIPS orders. M.W. now appeals.

## DISCUSSION

**I. M.W. has not demonstrated that she received ineffective assistance of counsel.**

¶15    M.W. first argues that she received ineffective assistance of counsel when her trial counsel failed to object to multiple hearsay statements at trial. She points to eight statements in particular, including:

- Officer Kleinfeldt's testimony that one of M.W.'s children told him that there was no other adult home during the incident on November 15, 2020.

- Flynn's testimony that M.W.'s three older children told her that they saw M.W. passed out from intoxication on November 15, 2020.

6

- Flynn's testimony about the statements John made to her about M.W.'s drinking and how it affected him.

- Flynn's testimony about the statements Sean made to her about M.W.'s drinking and how it affected him, including that he had to call John to bring them food.

- Flynn's testimony that Megan told her that she had the "same concerns" as John and Sean about her mother's drinking.

- Flynn's testimony that "there were calls" that M.W. was drinking alcohol and/or using Adderall in October 2018 and October 2019.

- Pechacek's testimony that she had spoken with M.W.'s treatment providers who told her that M.W. had unhealthy coping mechanisms and was high risk for another alcohol-related incident.

- Pechacek's testimony that M.W.'s children and their foster parents told her that M.W. was allowing A.N. to be present during unsupervised visits.

¶16    M.W. asserts that trial counsel not only failed to object to these hearsay statements, but also could not explain her reasons for not doing so at the postdisposition hearing. Although trial counsel guessed that she may have chosen not to object in order to avoid drawing the jury's attention to the testimony, she was not able to say she employed that strategy during the trial here. M.W. thus insists that the trial court erred when it determined that trial counsel had not been ineffective.

¶17    A parent's right to counsel in a TPR proceeding includes the right to effective assistance of counsel. *A.S. v. State*, 168 Wis. 2d 995, 1004-05, 485 N.W.2d 52 (1992). The test for determining whether a parent has received ineffective assistance of counsel in a TPR proceeding is the same test used in a criminal case. *Id.* at 1005 (citing *Strickland v. Washington*, 466 U.S. 668 (1984)). The test requires that the parent demonstrate both that counsel's performance was

7

deficient and that such deficient performance was prejudicial. ***A.S.***, 168 Wis. 2d at 1005. A court need not address both prongs of the ***Strickland*** test if a litigant has failed to make a sufficient showing on either one. ***Id.***, 466 U.S. at 697. This presents a mixed question of fact and law; this court will uphold the trial court's findings of fact unless they are clearly erroneous, but whether those facts fulfill the legal standard for ineffective assistance is a question of law which this court reviews de novo. ***State v. Thiel***, 2003 WI 111, ¶21, 264 Wis. 2d 571, 665 N.W.2d 305.

¶18     Deficient performance is shown where counsel's representation fell below "an objective standard of reasonableness." ***Strickland***, 466 U.S. at 687-88. A court must assume that counsel acted reasonably within professional norms, but a defendant overcomes this presumption by showing that counsel's actions were not a "sound trial strategy." ***Id.*** at 689. The deficiency prong is met when counsel's failures resulted from oversight rather than a reasoned defense strategy. *See* ***Wiggins v. Smith***, 539 U.S. 510, 534 (2003); ***Thiel***, 264 Wis. 2d 571, ¶51. The reasonableness of counsel's strategic decisions is assessed considering all of the circumstances at the time of the alleged errors. *See* ***Strickland***, 466 U.S. at 689. In order to satisfy the deficiency prong of the ***Strickland*** test, one must show that counsel made errors so serious that counsel was not functioning as counsel. ***Oneida Cnty. DSS v. Nicole W.***, 2007 WI 30, ¶33, 299 Wis. 2d 637, 728 N.W.2d 652.

¶19     At the postdisposition hearing, counsel testified regarding her failure to make hearsay objections to the challenged statements, stating

> I think I would have tried to minimize it as much as possible. There is a lot of negative information that comes in in trials like this so, you know, I just want to move through it as quickly as possible is sometimes a good option so the jury hears it but then you don't over emphasize it with an objection and then possibly being overruled and then additional focus on bad facts so I think sometimes I would let things pass because of that reason but I don't know that I

8

did that specifically here because I don't have that amazing memory unfortunately.

¶20 M.W. argues that trial counsel's performance was deficient for failing to object to the hearsay statements, as there was no exception which allowed for their admission, and trial counsel could provide no sound strategic reasons for not objecting. In addition, M.W. asserts that the hearsay statements of Officer Kleinfeldt and Flynn were not offered for any legitimate reasons other than for the truth of the matter asserted, as the reasons for Liam and Karen's removal from the home was adequately explained through Officer Kleinfeldt's non-hearsay testimony about the incident on November 15, 2020. M.W. also points out that, instead of offering the hearsay statements, the State could have called M.W.'s children to testify at trial, which would have eliminated the need to introduce Flynn's hearsay testimony about what the children had told her about M.W.'s alcohol use.

¶21 In turning to Pechacek's statements, M.W. takes issue with the trial court's determination that Pechacek's testimony was not hearsay because it was offered to explain how M.W. had failed to comply with the CHIPS orders and not for the truth of the matter asserted. M.W. points out that the State introduced Pechacek's testimony regarding what treatment providers had told her in order to show that M.W. had taken part in conduct inconsistent with the requirements of the CHIPS orders. Thus, M.W. concludes, the testimony was offered for the truth of the matter asserted: that M.W. had violated the CHIPS orders. Furthermore, M.W. argues that the State had no legitimate reason for introducing this hearsay testimony from Pechacek, as it could have called M.W.'s therapist, M.W.'s children, and the children's foster parents to testify at trial.

¶22 We conclude that trial counsel's performance was not deficient. In looking at the alleged hearsay statements challenged by M.W., counsel's

9

performance did not fall beneath an objective standard of reasonableness. First, as to Officer Kleinfeldt's testimony that M.W.'s children told him that there was no other adult present in the home during the incident on November 15, 2020, this statement was not offered for the truth of the matter asserted. Rather, it was offered to explain what led to Liam and Karen's initial removal from the home. Additionally, this information would have come in regardless, as the jury was able to watch footage from Officer Kleinfeldt's body camera, which showed no other adult in the home. It would therefore be objectively reasonable for trial counsel to choose not to make a hearsay objection.

¶23 As it relates to Flynn's testimony that M.W.'s three children told her that they saw M.W. passed out from drinking alcohol on November 15, 2020, we make the same determination. The statements were not offered for the truth of the matter asserted, but rather to explain why Liam and Karen were initially removed from M.W.'s care. The jury would have also been able to see this in Officer Kleinfeldt's body camera footage. It would therefore be objectively reasonable for trial counsel not to make a hearsay objection.

¶24 As it relates to Flynn's testimony, regarding her conversations with M.W.'s three older children about M.W.'s alcohol use, these were also not offered for the truth of the matter asserted, but rather to explain what led to Liam and Karen being removed from M.W.'s care. M.W. herself also testified that Liam and Karen were removed as a result of her alcohol use. It would therefore be objectively reasonable for trial counsel not to make a hearsay objection. This same reasoning would apply to Flynn's testimony that "there were calls" that M.W. was drinking alcohol and/or using Adderall in October 2018 and October 2019.

¶25    As it relates to Pechacek's testimony, including that she had spoken with treatment providers who told her that M.W. had unhealthy coping mechanisms and was at a high risk for another alcohol-related incident, and that M.W.'s children and their foster parents told her that M.W. was allowing A.N. to be present during unsupervised visits, the trial court had previously ruled that it would allow the testimony to come in to explain why Pechacek believed that M.W. had not satisfied the conditions of the CHIPS orders.  In addition, trial counsel stated at the postdisposition hearing that she most likely did not object because she knew "that there is case law that a social worker's opinion is considered in the nature of expert opinion and so the bases for her determinations can come in as well[.]"  While trial counsel did not specify which case law to which she was referring, this reasoning, coupled with the fact that the court had previously ruled the statements admissible, supports a determination that counsel's choice not to make a hearsay objection was objectively reasonable.

¶26    In sum, we cannot find that counsel's performance was deficient.  It did not fall below an objective standard of reasonableness, and M.W. has not overcome the presumption that counsel acted reasonably within professional norms. As noted in *Strickland*:

> A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.  Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance[.]

*Id.*, 466 U.S. at 689.  Because we do not find that counsel's performance was deficient, we need not address the second prong of the *Strickland* test, and hold that

M.W. has failed to demonstrate that she received ineffective assistance of counsel. *See id.* at 697.

**II. The trial court did not violate M.W.'s due process rights.**

¶27 Next, M.W. asserts that the trial court violated her constitutional due process rights when it ruled that she could not introduce evidence related to the fact that her sixth child, Thomas, still remained in her care. She insists that, in finding that such evidence was not relevant to the termination proceedings involving Liam and Karen, the court prevented her from presenting a meaningful defense.

¶28 M.W. points out that, in order to prove the ground of continuing CHIPS, the State was required to show that she failed to meet the conditions established in the CHIPS orders for Liam and Karen to return to her care. Such conditions required M.W. to provide safe care for her children by having a "safe, suitable and stable home, control her alcohol addiction, and to not allow domestic violence in her home." M.W. argues that evidence of her ability to care for Thomas and have him remain in her home was relevant to whether M.W. had met these conditions, as arguably, DMCPS would not have allowed Thomas to be in M.W.'s care if she did not have a safe home, had not addressed her alcohol issues, or had failed to stay away from domestic violence.

¶29 M.W. makes a similar argument as to the failure to assume parental responsibility ground, which required the jury to look at the "totality of the circumstances" throughout Liam and Karen's entire lives to determine whether M.W. had a "substantial parental relationship" with them. M.W. insists that evidence of her ability to care for Thomas and have him remain in her home was relevant to whether M.W. had accepted responsibility for the care of Liam and

Karen, as it "showed her dedication to maintaining a home that was safe and stable for children."

¶30    Thus, M.W. concludes that the trial court prevented her from presenting evidence central to her defense against the "fundamental elements" justifying termination, which as a result violated her due process rights.

¶31    The due process protections of the Fourteenth Amendment apply in TPR cases.  ***Brown Cnty. v. Shannon R***., 2005 WI 160, ¶56, 286 Wis. 2d 278, 706 N.W.2d 269.  A part of such protections is the opportunity to be heard and to present a complete defense.  ***Id.***, ¶¶64, 65.  A parent in a TPR case has a due process right to present a defense as to the "fundamental elements" justifying termination.  ***Id.***, ¶68.  Whether the exclusion of particular evidence has denied a person's constitutional right to present a defense is a question of law which this court reviews de novo.  ***State v. Dodson***, 219 Wis. 2d 65, 69-70, 580 N.W.2d 181 (1998). Relevant evidence is defined under WIS. STAT. § 904.01 as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

¶32    We agree with the trial court's determination, that evidence that Thomas still remained in M.W.'s care was not relevant to whether the State had proven grounds for the termination of M.W.'s parental rights to Liam and Karen. The fact that Thomas still remained in M.W.'s care does not make it more or less probable that M.W. had failed to assume parental responsibility for Liam and Karen or that M.W. had failed to fulfill the conditions of the CHIPS orders.  The only children that were included in these petitions were Liam and Karen, not any of M.W.'s four other children.  M.W.'s argument, that "arguably" DMCPS would not

have allowed Thomas to remain in M.W.'s care if she had failed to provide a safe, suitable, and stable home, is pure speculation. *See* WIS. STAT. § 904.03; ***Arents v. ANR Pipeline Co.***, 2005 WI App 61, ¶18, 281 Wis. 2d 173, 696 N.W.2d 194 (discussing admissibility of evidence that "is relevant and not speculative, remote or a waste of time"); ***Zebrowski v. State***, 50 Wis. 2d 715, 726, 185 N.W.2d 545 (1971) (discussing that testimony may be "excluded as irrelevant on the basis that it was so inconclusive and speculative as to have no probative value").

## CONCLUSION

¶33     Because M.W. has not shown that her trial counsel's performance was deficient, she has not demonstrated that she received ineffective assistance of counsel. In addition, the trial court did not violate M.W.'s due process rights when it ruled that evidence related to Thomas, another of M.W.'s children, was not relevant to the issues at hand.

*By the Court.*—Orders affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.

14