COURT OF APPEALS
DECISION
DATED AND FILED

March 1, 2023

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2021AP1024-CR**

STATE OF WISCONSIN

Cir. Ct. No. 2017CF462

IN COURT OF APPEALS
DISTRICT II

STATE OF WISCONSIN,

   PLAINTIFF-RESPONDENT,

 V.

JOSHUA L. WEIR,

   DEFENDANT-APPELLANT.

APPEAL from a judgment and an order of the circuit court for Winnebago County: JOHN A. JORGENSEN, Judge. *Affirmed*.

Before Gundrum, P.J., Grogan and Lazar, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1     PER CURIAM.   Joshua L. Weir appeals a judgment of conviction, following a jury trial, for physical abuse of a child—recklessly causing great bodily harm—as a repeater.   He also appeals an order denying postconviction relief.   On appeal, Weir argues the evidence supporting his conviction was insufficient, and the trial court erroneously exercised its discretion in certain evidentiary admissions.   Weir also argues that, during trial, the State engaged in prosecutorial misconduct, and Weir's counsel was ineffective for failing to object to the misconduct.   We reject Weir's arguments and affirm.

## BACKGROUND

¶2     On June 29, 2017, four-year-old Samantha[1] arrived at an emergency room in Oshkosh with life-threatening second- and third-degree burns on her legs and back and had to be "med-flighted" to Children's Hospital of Wisconsin in Wauwatosa.   Weir, who was Samantha's mother's boyfriend, advised medical staff in Oshkosh that he left a very hot bath unattended, and Samantha fell in. Medical staff at Children's Hospital flagged the case for child abuse, determining Samantha's injuries were not consistent with Weir's report.   Samantha's burns were "diagnostic for forced immersion with medical certainty" and caused Samantha "excruciating pain[.]"   The State charged Weir with physical abuse of a child—recklessly causing great bodily harm—as a repeater.

---

[1] Pursuant to the policy underlying WIS. STAT. RULE 809.86(4) (2019-20), we use a pseudonym when referring to the victim in this case.  We also use a pseudonym when referring to the victim's mother ("Susan").

All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

¶3      The court held a three-day jury trial.  At trial, Dr. David Gourlay, a pediatric surgeon who runs the pediatric trauma program at Children's Hospital and oversees all burn patients, provided an overview of the different degrees of burns and explained that third-degree burns often require skin grafts.  Samantha had to stay in the hospital for a few months and had skin grafts on her "lower legs, feet, as well as her thighs, buttocks, and a little bit on her torso."  Gourlay used healthy skin from Samantha's back and front torso for the skin grafts.

¶4      Gourlay also testified that if a child fell into hot water, he would expect to see evidence of water splashes or splash burns as the child tried to get away from the source of pain, unless the child was being held in the water.  In his twenty years of practice, Gourlay never had a case in which a patient came in contact with a burning heat source and became immobilized.  In preparation for this case, Gourlay researched medical literature for "a freeze reaction to exposure to heat" and found nothing.

¶5      Dr. Thomas Sato, a pediatric surgeon at Children's Hospital who specializes in burn treatments, testified he participated in Samantha's care.  Samantha needed narcotics to manage her pain.  Sato testified that when the body is burned "the response to the body is immediate pain[,]" and a natural reaction to withdraw from the pain is triggered.  The only exception to this withdrawal reaction would be for an individual who lacked physical sensation because of illness or spinal cord damage.  Samantha had neither condition.  In Sato's thirty-one years of clinical practice, he had never seen or read in medical literature about a phenomenon where an otherwise neurologically fit person came in contact with a heat source and was immobilized by it.

¶6 The jury heard that Gourlay, Sato, and Children's Hospital of Wisconsin were not being compensated for Gourlay's and Sato's testimony. Gourlay and Sato each generate approximately $6,000 per day in clinical revenue for patient care. The two doctors' participation in this case cost the practice over $30,000.

¶7 On June 30th, the morning after Samantha's injuries, Detective Jeremy Wilson measured the temperature of the water coming out of the bathtub's hot-water tap at 135 degrees Fahrenheit.[2] Wilson also found a pair of damp black leggings next to the bathtub. When Wilson returned to Weir's residence approximately one month later to do a further temperature analysis, he learned the landlord turned the water heater down following Samantha's burns. Wilson and the landlord tried to recreate the water heater's setting, and Weir measured the temperature of the water coming out of the bathtub's hot-water tap at 130 degrees and the water in the bathtub at 128 degrees.

¶8 Dr. Lynn Sheets is the medical director of the child abuse program at Children's Hospital as well as a professor with the Medical College of Wisconsin. She is board certified in both general pediatrics and child abuse pediatrics. Sheets assisted in examining Samantha while she was heavily sedated in the operating room with the burn surgeons. Upon viewing Samantha's burns, it was obvious to Sheets that Samantha had been submerged in the water with her thighs pressed up tightly against her abdomen and her knees above the water because Samantha had

---

[2] Samantha arrived at the hospital at approximately 10:20 p.m. on June 29th, and police executed a search warrant for Weir's unit at approximately 5:30 a.m. on June 30th. During the search, police did not have access to the water heater because it was in the landlord's unit, and no one was home at the landlord's unit.

"sparing," or unburned skin, on her knees, thighs, and abdomen. Photos of Samantha's burns were shown to the jury. Sheets pointed out to the jury the "tide line" or water line on Samantha's skin, separating the unburned skin from the burned skin. Sheets explained that "if you line up the line, you can put the child in the position that she was in at the time that she was burned."

¶9 Sheets testified the "hot" water threshold for adults is approximately 113 degrees Fahrenheit, and it is even lower for children. At that point, when "hot" is perceived by the body, a withdrawal reflex kicks in. Sheets explained that, in this case, the police reported the bath water's maximum temperature was 130 degrees Fahrenheit, and "130 is well above the painful threshold. In fact, the child would have immediately perceived that as very hot and would have withdrawn as soon as that water is encountered." Sheets explained that when a child accidentally falls into a hot bath:

> you will see lots of burns kind of everywhere because the child is struggling, trying to get out. You will see sometimes splash burns, although at 130, you may not see a lot of splash but you will see burns everywhere as the child is struggling and then manages to get out. So the burns, you don't see like a sharp tide line and the things we saw with [Samantha].

¶10 Sheets explained Weir's version of events was that Samantha "must have fallen into the tub, was found in a squatting position like you poop in the forest and said the water was hot and was unable to get out and was basically in a squatting, hands out, position." This version of events was "[a]bsolutely not" possible in Sheets' view because

> a child falling into water does not do that. But a child who's able to get into the water as soon as they encounter the water, they are withdrawing. So if she, say, lost her balance, you would not expect to see sharp tide lines. At 130 degrees, you're talking about an exposure in that

5

> position of between 10 and 30 seconds to get this kind of a burn so a child would not do that. And then the position is one of a sitting child, not squatting, and with her legs really crunched up as though pushed into the front of the tub near the faucet where her legs can't move.

¶11 Sheets believed Samantha had suffered physical abuse "[b]ecause the pattern of the burns and unburned skin on her was absolutely classic -- basically, a teaching case for what forced immersion burns look like." Sheets elaborated she has over thirty years of experience, and there is a large amount of published research on the appearance of a forced immersion burn. Sheets opined Samantha "has inflicted forced immersion burns that involved about 34 percent total body surface area in a pattern that was absolutely diagnostic for child physical abuse with medical certainty."

¶12 Weir testified that he first gave Samantha's older and younger brothers a bath before bed. Samantha indicated she did not want to take a bath because "she had one at her grandparents so then I just said I'd let your mom deal with it when she got home." Weir then drew a bath for himself and "filled up the bathtub with hot water. I normally do that because it takes me a little while to get them all laid down, and it takes a while for the bathtub to fill up. And you[']ve seen the picture, the nozzle is this big so it takes a while so I filled up with hot water[.]" He typically gets into the bathtub twenty to thirty minutes after he fills it.

¶13 While the bath water was running, he was dressing Samantha's younger brother in the bedroom. Weir heard screaming from the bathroom, and he went to the bathroom. Samantha was in the bathtub screaming and told Weir the water was hot. Weir told her to get out of the bathtub, and Samantha said she could not get out. Weir pulled her out and tried to stand her up. Samantha could

not support her weight and she appeared to be in quite a bit of pain. She was wearing black leggings, and they were steaming.

¶14    Weir immediately called Samantha's mother, Susan, who was at work. Susan told Weir to put her in a cool bath, which was what he did. Once in the cool bath Samantha "kind of relaxed a little bit and chilled out, started playing with the toys that I had in there for [Samantha's little brother], started messing with them, asked me to wash her hair. And I thought everything was good, she was calm." Weir washed Samantha's hair. When he was done washing her hair, he took her out of the bath and started drying her off with a towel. Her skin started to peel off her legs. Weir called Susan and said we have to take her to the hospital. Weir had been convicted of three crimes.

¶15    Dr. André Loyd, who has a PhD in biomechanical engineering and specializes in injury biomechanics, is employed as a forensic engineer and investigates and then recreates how injuries occurred. Loyd's company was hired by the defense team to look into Samantha's injuries. He tested Weir's and Sheets' explanations to see which one was most consistent with the evidence. Loyd used a body surrogate to recreate the position Samantha would have been in at the time of the burns. Loyd opined Weir's version of events was more consistent with the evidence. The defense paid $6,000 for Loyd's testimony.

¶16    Dr. Shaku Teas is board certified in anatomic, clinical, and forensic pathology. She is a former medical examiner with the Cook County Medical Examiner's Office, has performed over 6,000 autopsies, and is trained in evaluating all kinds of injuries, including burns. Teas believed Samantha climbed into the bathtub herself and was burned. Teas opined Samantha's injuries were accidental and not from forced immersion. She explained that to conclude this

7

was forced immersion, she would need to see other injuries. Teas also did not believe Samantha's injuries had the "so-called pattern" one would see with forced immersion and opined the burn pattern on Samantha's thighs showed a "little scalloping[,]" which meant there was some motion to the hot water.

¶17 When asked if people can have delayed reactions to pain, Teas responded, "[T]here are people who actually get shot and say, I didn't realize I was shot until I saw the blood." She opined this effect would have prevented Samantha from withdrawing from the hot water. On cross-examination, the State asked Teas, "Can you give the jury one example, specific example, not urban legend or even ER legend from Cook County hospitals, someone who was shot and didn't know it?" Teas responded that she "just heard on NPR that this person said the gunshot hit him, and he didn't realize it hit him until he saw the blood." Teas eventually conceded she could not point to a single case where someone had been shot and did not know it.

¶18 A jury found Weir guilty. Additional facts will be included below.

## DISCUSSION

¶19 Weir makes four arguments on appeal: (1) the evidence supporting his conviction was insufficient; (2) the trial court erroneously exercised its discretion by permitting the State to introduce evidence regarding Samantha's medical procedures and pain as well as the State's experts' compensation; (3) the State engaged in prosecutorial misconduct during opening statements, a courtroom demonstration, and closing arguments; and (4) Weir's counsel was ineffective for failing to object to the prosecutor's misconduct. We address each argument in turn.

### I. Sufficiency of the Evidence

¶20 Weir first argues his conviction was based solely on Sheets' expert opinion that Samantha's injuries were forced immersion burns. He argues that Sheets' testimony was patently unreliable and therefore insufficient to support his conviction.

¶21 A conviction based on a jury's verdict will be sustained unless "the evidence, viewed most favorably to the state and the conviction, is so lacking in probative value and force that no trier of fact, acting reasonably, could have found guilt beyond a reasonable doubt." *State v. Poellinger*, 153 Wis. 2d 493, 507, 451 N.W.2d 752 (1990). We will "only substitute [our] judgment for that of the trier of fact when the fact finder relied upon evidence that was inherently or patently incredible—that kind of evidence which conflicts with the laws of nature or with fully-established or conceded facts." *State v. Tarantino*, 157 Wis. 2d 199, 218, 458 N.W.2d 582 (Ct. App. 1990).

¶22 At the outset, we observe Weir's sufficiency-of-the-evidence argument assumes that, but for Sheets' testimony, the jury would have believed Weir's version of events. This argument, however, ignores Gourlay's and Sato's testimony that humans have a natural withdrawal instinct to hot water, and a child with no mobility limitations would have immediately withdrawn from the hot water. This argument also ignores the fact that the jury could have simply rejected Weir's version of events, determining it was implausible that a four-year old who arrives at an emergency room with second- and third-degree burns, needs narcotics to manage her pain, and has to be flown to burn specialists at another hospital, was, after accidently falling into a hot bath, completely fine in a cooler bath, playing with bath toys, and wanted her hair washed. *See Poellinger*, 153 Wis. 2d

at 506 ("It is the function of the trier of fact, and not of an appellate court, to fairly resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.").

¶23    In any event, Weir first contends Sheets' testimony was unreliable because she did not actually know the bath water's temperature, and if it was higher than Sheets' assumed 130 degrees Fahrenheit, the burns would have happened quicker. However, that Samantha's injuries may have happened quicker does not mean Sheets' opinion that the pattern of Samantha's injuries "was absolutely diagnostic for child physical abuse with medical certainty" is inherently unreliable.

¶24    Weir then argues Sheets' testimony about the absence of splash burns was "inherently unreliable" because she admitted she would not expect splash burns at 130 degrees but supposedly "relied upon" a lack of splash burns to exclude accidental immersion. Sheets, however, did not rely on the mere absence of splash burns to exclude accidental immersion. Rather, Sheets testified that in accidental immersion cases,

> [Y]ou will see lots of burns kind of everywhere because the child is struggling, trying to get out. You will see sometimes splash burns, although at 130, you may not see a lot of splash but you will see burns everywhere as the child is struggling and then manages to get out. So the burns, you don't see like a sharp tide line and the things we saw with [Samantha].

Again, Sheets' opinion was not based solely on the absence of splash burns. Rather, she testified that based on the pattern of Samantha's injuries, Samantha suffered forced immersion burns.

¶25     Weir next contends Sheets' testimony was unreliable because she testified she sees "sparing," or unburned skin, in both forced and accidental immersion cases.  Sheets, however, did not opine that evidence of unburned skin means forced immersion occurred.  Rather, she opined the pattern of Samantha's burned and unburned skin showed she suffered forced immersion burns.

¶26     Weir then asserts it was unknown whether Samantha was wearing leggings at the time of her injury and argues this unknown factor made Sheets' testimony unreliable.  But, Sheets addressed the leggings in her testimony.  She explained that if a child is wearing clothing at the time of a burn, fibers from the clothing will be present in the child's injuries.  Sheets saw no evidence in Samantha's injuries that she had been wearing leggings when she was burned.  More significantly, Sheets testified that, even if Samantha had been wearing leggings when she was burned, given the pattern of the burns, it would not have changed her opinion that this was forced immersion.

¶27     In sum, Sheets was a highly qualified expert who gave persuasive and compelling testimony that Samantha's burns proved she was forcibly immersed in hot water.  Sheets' testimony was based on her examination of Samantha along with her decades of research and practice.  Her testimony was not patently unreliable.  A reasonable trier of fact could have found, based on this testimony, that Weir forcibly immersed Samantha in hot water.  *See Poellinger*, 153 Wis. 2d at 508.  The evidence was sufficient to sustain his conviction.

## II.     Evidentiary Admissions

¶28     Weir argues the trial court erroneously exercised its discretion by permitting the State to introduce evidence regarding Samantha's medical procedures and pain as well as the State's experts' compensation.  "The admission

of evidence is subject to the circuit court's discretion[,]" and "[w]e will not disturb the circuit court's decision to admit evidence unless the court erroneously exercised its discretion." *State v. Ringer*, 2010 WI 69, ¶24, 326 Wis. 2d 351, 785 N.W.2d 448. A court properly exercises its discretion when it "examine[s] the relevant facts, applied a proper standard of law, and, using a demonstrated rational process, reached a conclusion that a reasonable judge could reach." *Loy v. Bunderson*, 107 Wis. 2d 400, 415, 320 N.W.2d 175 (1982). We "will search the record for reasons supporting the trial court's decision" to admit evidence. *State v. Hogan*, 2021 WI App 24, ¶26, 397 Wis. 2d 171, 959 N.W.2d 658.

¶29     Weir asserts the testimony regarding Samantha's medical procedures and pain was not relevant to the elements of his charged offense, and any probative value was outweighed by the danger of unfair prejudice. The State responds that Weir only objected before the trial court on the basis of relevancy and has therefore forfeited his assertions that this evidence was unduly prejudicial. We agree. *See State v. Mercado*, 2021 WI 2, ¶35, 395 Wis. 2d 296, 953 N.W.2d 337 ("Forfeiture occurs when a party fails to raise an objection."); *see also* WIS. STAT. § 901.03(1)(a) (objection must be timely and specific). Weir may only directly challenge the relevancy of this evidence.

¶30     "'Relevant evidence'" is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." WIS. STAT. § 904.01. The charge of physical abuse of a child—recklessly causing great bodily harm—has three elements. *See* WIS JI—CRIMINAL 2111 (2009). One element the State was required to prove was that Weir "caused great bodily harm to [Samantha]." *See id.*; *see also* WIS. STAT. § 948.03(3)(a). "'Great bodily harm' means injury which creates a substantial risk of death, or which causes serious

12

permanent disfigurement, or which causes a permanent or protracted loss or impairment of the function of any bodily member or organ or other serious bodily injury." WIS JI—CRIMINAL 2111; *see also* WIS. STAT. §§ 948.03(3)(a), 939.22(14).

¶31 On appeal, Weir appears to assert the evidence of Samantha's medical procedures and the pain she suffered was not relevant because the State already had enough proof of "great bodily harm." Weir argues "[t]he fact that the victim's skin was peeling off so much so that it could not heal on its own, and, required skin grafts is all the proof necessary to meet that element." However, relevancy requires a court to determine whether the evidence has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *See* WIS. STAT. § 904.01. Here, the fact that Samantha spent months in the hospital undergoing skin grafts—along with a description of what a skin graft actually is and of how much pain Samantha went through—made it more probable that Samantha suffered "other serious bodily injury." *See* WIS. STAT. § 939.22(14). The evidence was relevant, and the trial court did not err in admitting this evidence. *See* § 904.01.

¶32 Weir next contends the trial court erred by permitting the State to elicit testimony that Gourlay and Sheets did not charge the State for their testimony and took three days off of work for this case. Weir argues this evidence was erroneously admitted because, at the time the evidence was admitted, he had not attacked the doctors' credibility. Weir argues a witness's credibility cannot be bolstered until his or her credibility is attacked.

¶33   At the outset, Weir repeatedly argues the State elicited testimony that Sheets did not charge for her testimony. However, the record cites provided by Weir as well as our independent review of the Record show that Gourlay and Sato (the burn surgeons) did not charge for their testimony. The Record is silent as to whether Sheets charged the State for her testimony.

¶34   In any event, the State responds that the evidence was properly admitted to show both credibility and potential for bias. We address the evidence's potential for bias. Bias "'describe[s] the relationship between a party and a witness which might lead the witness to slant, unconsciously or otherwise, his testimony in favor of or against a party.'" *State v. Long*, 2002 WI App 114, ¶17, 255 Wis. 2d 729, 647 N.W.2d 884 (citation omitted). Bias may be induced "'by the witness' self-interest.'" *Id.* (citation omitted). "'Proof of bias is almost always relevant[.]'" *Id.* (citation omitted). "'[T]he bias or prejudice of a witness is not a collateral issue.'" *Id.*, ¶18 (citation omitted). "Because evidence of bias or lack of bias is substantive, rather than collateral, it may be developed on direct examination, as well as cross-examination, just like any other substantive evidence." *See United States v. Fusco*, 748 F.2d 996, 998 (5th Cir. 1984).

¶35   Here, the evidence was relevant and admissible to show that the State's experts had no personal or professional incentives to reach a particular conclusion and were not biased by any financial incentives in this case. This evidence was also relevant as a contrast against the defense witnesses who were paid for their testimony. The trial court did not err by admitting the evidence. *See Ringer*, 326 Wis. 2d 351, ¶24.

### III. Prosecutorial Misconduct

¶36    Weir next argues he is entitled to a new trial because the State engaged in prosecutorial misconduct during its opening statement, a courtroom demonstration, and in closing argument. "The determination of whether prosecutorial misconduct occurred and whether such conduct requires a new trial is within the trial court's discretion." *State v. Lettice*, 205 Wis. 2d 347, 352, 556 N.W.2d 376 (Ct. App. 1996). "An appellate court will sustain a discretionary act if the trial court examined the relevant facts, applied a proper standard of law, and used a rational process to reach a conclusion that a reasonable judge could reach." *Id.* (citation omitted).

¶37    Weir concedes he did not object to the prosecutor's opening statement or closing argument. Although Weir did object to the prosecutor's courtroom demonstration, the demonstration immediately ceased, and he never moved for a mistrial on that basis. Weir's failure to object or move for a mistrial typically operates as a forfeiture of the issue, and we would be required to analyze these allegations using the ineffective-assistance-of-counsel framework. *See State v. Davidson*, 2000 WI 91, ¶86, 236 Wis. 2d 537, 613 N.W.2d 606. Weir, however, argues the prosecutor's actions constitute "plain error" for which no objection was necessary.

¶38    Plain error is an error so fundamental that a new trial or other relief must be granted, even though the action was not objected to at the time. *State v. Jorgensen*, 2008 WI 60, ¶21, 310 Wis. 2d 138, 754 N.W.2d 77. "The error, however, must be 'obvious and substantial.'" *Id.* (citation omitted). "Courts should use the plain error doctrine sparingly." *Id.* "When a defendant alleges that a prosecutor's statements constituted misconduct, the test we apply is whether the

15

statements 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Davidson*, 236 Wis. 2d 537, ¶88 (citation omitted).

### A. Opening Statement

¶39    Weir argues that several comments made by the prosecutor during opening statements were so improper that they constituted prosecutorial misconduct under the doctrine of plain error. The general purpose of an opening statement "is to advise the jury concerning the questions of fact involved, so as to prepare their minds for the evidence to be heard[.]" *Beavers v. State*, 63 Wis. 2d 597, 606, 217 N.W.2d 307 (1974).

¶40    Weir claims the prosecutor committed misconduct by referring to his experts as, for example, "smart," "hard working," and "rocket scientists[.]" In context, the prosecutor was simply predicting what the evidence would show at trial—that the State's witnesses were highly qualified medical professionals. The evidence set to be presented at trial supported the prosecutor's predictions. *See State v. Adams*, 221 Wis. 2d 1, 17, 584 N.W.2d 695 (Ct. App. 1998) (a prosecutor is free to comment even "on the credibility of witnesses as long as that comment is based on evidence presented").

¶41    Weir also argues the prosecutor engaged in misconduct by predicting the evidence would show it cost the State's experts $40,000 to testify because they had to take three days off work. He contends the prosecutor both exaggerated the cost and "attributed the hospital's loss to the doctors[.]" In context, the prosecutor's statement was a prediction of what the evidence would show. Any possible confusion about the prosecutor's statement was remedied when Gourlay told the jury it did not cost him any money personally to testify, but it cost his practice approximately $30,000 for he and Sato to testify.

¶42    Weir then argues the prosecutor engaged in misconduct by attacking the defense witnesses.    Weir, for example, objects to the prosecutor's characterization of the defense experts' opinions as "insignificant," "worthless[,]" and a "throw away line" as well as the prosecutor's statement that he believed Loyd was a "hired professional for litigation[.]"    However, Loyd was a "hired professional for litigation"; he testified the defense hired his company for the litigation.

¶43    As to the prosecutor's remaining statements, they were, in context, predictions of the evidence.    The prosecutor stated he believed a defense expert would testify that if one sat in scalding hot water, the person would be burned, which the prosecutor stated would be an "insignificant" opinion because everyone agreed to that premise.    The prosecutor also predicted that to explain the defense's theory that Samantha willingly sat in hot water for a period of time without realizing she was being burned, the defense experts relied on a theory that likened hot-water exposure to frostbite exposure, which the prosecutor predicted would be "kind of a throw away line."    The prosecutor elaborated on his prediction, explaining the evidence at trial would show the defense theory was not based on medical experience or literature, and as a result, the jury would find the defense experts' opinions to be "worthless."

¶44    At the postconviction hearing, the prosecutor agreed that some of his language was perhaps too informal—he offered, for example, that he should have predicted the jury would find the defense experts' opinions to have "no value" or "low value" instead of being "worthless[.]"    Regardless, we do not conclude that the prosecutor's statements "so infected the trial with unfairness as to make the resulting conviction a denial of due process."    *See **Davidson***, 236 Wis. 2d 537, ¶88 (citation omitted).

17

## B. Courtroom Demonstration

¶45    Weir argues the prosecutor's courtroom demonstration with Loyd constituted prosecutorial misconduct because, during the demonstration, "the prosecutor put his foot on [Loyd's] back to push him forward." Weir argues "[p]utting your foot on another person is a demeaning action." Weir contends there was no purpose to the courtroom demonstration, and the prosecutor did this to "show the prosecutor's disdain and contempt for Weir and his defense."

¶46    We disagree with Weir's depiction of the courtroom demonstration. During the demonstration, Loyd sat on the floor of the courtroom, showing the jury how Samantha may have been sitting in the bathtub. The prosecutor asked for permission to touch Loyd during parts of the demonstrations, and Loyd said, "Sure. Touch away." The prosecutor asked, "[I]f I take your shoulders and I force this way forward, right? Your legs can't go forward, right?" Loyd responded, "Yep." The prosecutor continued, "And your butt doesn't go back, right?" The defense objected on the basis that the prosecutor's foot was on his back, and the prosecutor stopped the demonstration.

¶47    At the postconviction hearing, the trial court found the demonstration appropriate because it assisted the jurors in understanding Loyd's testimony about body positions and movements of the body. The court stated that at the point the demonstration went too far, the defense objected, the State stopped before the court ruled, and the defense addressed the demonstration on redirect. We conclude that, in context, the demonstration did not "so infect[] the trial with unfairness as to make the resulting conviction a denial of due process." *See **id.*** (citation omitted).

### C. Closing argument

¶48    "Closing argument is the lawyer's opportunity to tell the trier of fact how the lawyer views the evidence and is usually spoken extemporaneously and with some emotion." *Adams*, 221 Wis. 2d at 19 (citation omitted). During closing arguments, the prosecutor is free to "comment on the evidence, detail the evidence, argue from it to a conclusion, and state that the evidence convinces him or her and should convince the jurors." *Id.* "There is a fine distinction between what is and is not permitted concerning the lawyer's personal opinion." *State v. Mayo*, 2007 WI 78, ¶43, 301 Wis. 2d 642, 734 N.W.2d 115. "Even if there are improper statements by a prosecutor, the statements alone will not be cause to overturn a conviction. Rather, the statements must be looked at in context of the entire trial." *Id.*

¶49    Weir asserts the prosecutor's closing argument that the State's experts were "rocket scientist level professionals," "very dedicated," and "elite" was improper. We conclude these were proper arguments based on the evidence of the experts' qualifications and experience. We also conclude the prosecutor was entitled to argue that his witnesses' opinions were more valuable because his witnesses provided life-saving treatment and "conducted 'research to promote child safety.'" These arguments were based on the evidence introduced at trial. *See Adams*, 221 Wis. 2d at 19.

¶50    Weir then objects to a portion of the prosecutor's closing where the prosecutor argued:

> And I got a little triggered by Dr. Teas throwing out that line about people being shot and not realizing it, and I mean, it's really -- it is completely far away from the importance of the issues that you have to decide in that jury room, but I guess the reason I got irritated, this is a serious

> matter, as much as a court case comes, life or death matter. This child suffered an excruciating injury, and it's not a game to figure out whether the defendant did it or not. It's not a game for him, it's not a game for the community, and it's not a game for the family, and it's not a game for his family. And to just throw in an urban legend as science to persuade you to believe her assessment, it just irritated me.

At trial, to explain why Samantha would sit in hot water without withdrawing, Teas likened it to a situation where someone was shot and did not realize it. When pressed, Teas was unable to provide a single specific example of someone getting shot and not realizing it. The prosecutor argued a conclusion from the evidence, as is permitted under *Adams*, 221 Wis. 2d at 19.

¶51 Finally, Weir objects to the prosecutor's argument that Weir "'admits that what he did caused great bodily harm'" to Samantha. In context, however, the prosecutor's statement was accurate. On cross-examination, Weir testified that he drew the bath and that the bath caused Samantha great bodily harm. The prosecutor then asked, "Do you agree that your actions caused [Samantha] great bodily harm?" and Weir replied, "I believe in part it did."

¶52 In the context of the entire trial, the prosecutor's arguments did not rise to a level where they "so infected the trial with unfairness" that it violated Weir's due process right. *See Davidson*, 236 Wis. 2d 537, ¶85. We also observe that the trial court specifically instructed the jury that the attorneys' closing arguments and opinions were not evidence. The court's instruction put the arguments in proper context for the jury. *See State v. LaCount*, 2008 WI 59, ¶23, 310 Wis. 2d 85, 750 N.W.2d 780 (we presume a jury follows the court's instructions).

## IV. Ineffective assistance of counsel

¶53 Finally, Weir argues his trial counsel was ineffective for failing to object to the alleged prosecutorial misconduct identified above. To establish a claim of ineffective assistance, a defendant must prove both: (1) deficient performance by counsel; and (2) prejudice resulting from that deficient performance. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Sholar*, 2018 WI 53, ¶32, 381 Wis. 2d 560, 912 N.W.2d 89. We need not address both elements of the ineffective assistance test if the defendant fails to make a sufficient showing on one of them. *State v. Swinson*, 2003 WI App 45, ¶58, 261 Wis. 2d 633, 660 N.W.2d 12.

¶54 To demonstrate prejudice, a defendant must show that counsel's errors were so serious that the defendant was deprived of a fair trial. *Id.* There must be "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A reasonable probability is a probability sufficient to undermine our confidence in the outcome. *See id.*

¶55 Reviewing the prosecutorial misconduct issue under the ineffective-assistance-of-counsel framework, we conclude Weir has failed to demonstrate prejudice from his trial counsel's failure to object to the prosecutor's comments. In this case, the State's experts were experienced medical specialists who directly treated Samantha. Sheets' opinion that Samantha's injuries were caused by forced immersion was unequivocal and supported by the burn lines on Samantha's body and the fact that Samantha showed no injuries consistent with an attempt to get out of the hot water. The defense experts' opinions that Samantha got into the bathtub herself and sat in the hot water, without attempting to get out, was contradicted by

the State's experts who testified humans have an immediate withdrawal reflex to hot water.

¶56 Moreover, no reasonable jury would believe that a four-year old who arrived at an emergency room with life-threatening burns, needed narcotics to manage her pain, and had to be "med-flighted" to burn specialists at another hospital, was, after accidently falling into the hot bath, as Weir described— "chilled out" and "calm" in a cooler bath, playing with bath toys, and wanted her hair washed. Based on all the evidence of Weir's guilt, there was no likelihood that trial counsel's failure to object to the prosecutor's comments or actions prejudiced Weir. *See **Strickland***, 466 U.S. at 694. His ineffective-assistance-of-counsel claim fails.

> *By the Court.*—Judgment and order affirmed.

> This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.